432 A.2d 1375

INDEPENDENT STATE STORE UNION, et al., and
Pennsylvania Tavern Association, Max M. McCombs
and Sandra Lee Keim and Wine Institute

v.

PENNSYLVANIA LIQUOR CONTROL BOARD, Daniel W. Pennick, Chairman, and Ralph O. Barnett, Mario Mele, Members,
Pennsylvania Liquor Control Board, Appellants.

Supreme Court of Pennsylvania.

Argued May 18, 1981.

Decided July 2, 1981.

146

Andrew S. Gordon, Allen C. Warshaw, Deputy Atty. Gen., for appellants.

John H. Bream, Harrisburg, for appellee Pa. Tavern Assn.

John D. Killian, Harrisburg, for appellee Indep. State Store Union, et al.

Terry Bossert, Harrisburg, for appellee Wine Institute.

Before ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

The Pennsylvania Liquor Control Board appeals from decrees of a single judge of the Commonwealth Court granting applications for a preliminary injunction which prohibits the Board from carrying out its plan to implement a new pricing system for State Liquor Store merchandise. We conclude that the preliminary injunction was improperly issued. Hence we vacate the Commonwealth Court's decree and dismiss the applications.

I

The Liquor Code, from which the Board draws its authority,

"shall be deemed an exercise of the police power of this Commonwealth for the protection of the public welfare, health, peace and morals of the people of the Commonwealth and to prohibit forever the open saloon . . . ."

Act of April 12, 1951, P.L. 90, § 104(a), 47 P.S. § 1–104(a) (1969). The Code's stated purpose

"is to prohibit the manufacture of and transactions in liquor, alcohol and malt or brewed beverage which take place in this Commonwealth, except by and under the control of the [Liquor Control Board] as herein specifically provided, and every section and provision of the act shall be construed accordingly. The provisions of this act dealing with the manufacture, importation, sale and dispensation of liquor, alcohol and malt or brewed beverages within the Commonwealth through the instrumentality of the board and otherwise, provide the means by which such control shall be made effective."

Id., § 104(c), 47 P.S. § 1–104(c).

Included within the broad authority granted to the Board is the power "to fix the wholesale and retail prices at which liquors and alcohol shall be sold at Pennsylvania Liquor Stores . . . ." Id., § 207(b), 47 P.S. § 2–207(b) (Supp.1981). The Board's power over pricing is limited by the proviso that

"in fixing the sale prices, the board shall not give any preference or make any discrimination as to classes, brands or otherwise . . . ." Id. However, this proviso itself is limited by three exceptions:

> (1) "except to the extent and for the length of time necessary to sell such classes or brands in compliance with any Federal action freezing or otherwise controlling the prices of said classes or brands";

> (2) "except where special sales are deemed necessary to move unsaleable merchandise"; and

> (3) "except where the addition of a service or handling charge to the fixed sales price of any merchandise in the same comparable price bracket, regardless of class, brand or otherwise, is, in the opinion of the board, required for the efficient operation of the State store system."

Id.

Before implementation of the new pricing system, the Board applied a uniform percentage-of-price markup (48%) to items sold in State liquor stores. Thus, items with relatively low prices carried correspondingly low markups, even though the handling costs of lower priced items approximately equalled those with higher prices.

In September of 1979, the Auditor General requested the assistance of the national accounting firm of Touche, Ross & Co. in conducting a comprehensive audit of the operations of the Board. In its report, issued in July of 1980, Touche, Ross concluded:

> "the current pricing mechanism of the PLCB resulted in the sale below fully absorbed cost of approximately 30 percent of the 130 million bottles sold in 1979. The impact on profitability of selling below cost is apparent while the [effect] on the efficient and economical utilization of resources (such as human resources, inventory, store size, etc.) is less discernible. To the extent, however, that store profitability is used to make decisions regarding such items as store hours, store operations, etc., irrational decisions could be made that might not give rise to improving resource utilization."

The report of Touche, Ross went on to estimate that "the PLCB in fiscal 1979 sacrificed revenues of approximately $9.5 million by pricing certain items below fully absorbed costs . . . ."

After submission of the Touche, Ross report, the Board sought the opinion of the Attorney General on the legality of imposing a uniform handling charge on each unit sold. On September 10, 1980, the Attorney General expressed the view that such a uniform handling charge, also called a "fixed allocation cost," is permissible so long as it bears some relationship to the actual cost of handling the merchandise," and "if, in the Board's opinion, it is required for the efficient operation of the State Store System."

Board staff studies revealed that actual handling costs per bottle are approximately 92¢. Relying upon this information, as well as upon the advice of the Auditor General that the existing pricing structure was "inequitable and not in conformance with good business practices," the Board, on September 16, 1980, formally resolved first to reduce its percentage-of-price markup from 48% to 25%, and then to apply an 81.25¢ retail handling charge to each item. Also, the Board reduced the wholesale price discount given to retail licensees from 16⅔% to 12½%.

The meeting at which the Board adopted its resolution was advertised and fully open to the public. The resolution was not published in the Pennsylvania Bulletin. The pricing changes were to take effect the following day, September 17, 1980. In anticipation, the Board, on September 10, 1980, had informed State Store personnel of the pricing changes and had outlined pricing change procedure.

## II

Three sets of complainants with different interests immediately commenced proceedings in the Commonwealth Court, challenging the validity of the Board's resolution. The first set consists of The Pennsylvania Tavern Association, Max A. McCombs, and Sandra Lee Keim. As its name suggests, the Tavern Association is an association of owners of taverns

(and restaurants) located in the Commonwealth licensed to sell liquor, wine and malt beverages at retail. Max McCombs is an owner of a restaurant who proceeded on his own behalf and "as a class action," on behalf of retail licensees and clubs, "whether or not members of the Pennsylvania Tavern Association." Sandra Lee Keim is "an adult individual residing in Wormleysburg, Cumberland County, . . ." who proceeded on behalf of herself and, also "as a class action," on behalf of "all other patrons and consumers of alcoholic or malt beverages . . . ." This first set filed a joint complaint in equity challenging the Board resolution insofar as it reduced the retail licensees discount from 16⅔% to 12½%. According to these complainants, the Board's resolution was adopted in violation of the Open Meeting Law, Act of July 19, 1974, P.L. 486, § 1 et seq., 65 P.S. § 261 et seq. (Supp.1981), which requires meetings or hearings of agencies at which "formal action" is scheduled or taken to be open to the public. The complaint alleged that, as to the retail licensees, the difference in the rate of discount is, "in many cases, the difference between maintaining a going business and bankruptcy" and that, as to customers, the difference "would require an increase in the retail price of said beverages dispensed to the public."

The second set of complainants includes the Independent State Store Union, an organization whose membership includes over six hundred managers of State liquor stores. Also included are twenty-eight persons, all of whom are adult residents of Pennsylvania and customers of the State liquor stores. This second set filed a petition for review objecting to the imposition of the handling charge of 81.25¢ on units sold. They complain that the Board's resolution violated both the non-preference, non-discrimination clause of section 207 of the Liquor Code (see supra text), and the Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, § 101 et seq., 45 P.S. § 1101 et seq. (Supp.1981), which conditions the validity of administrative regulations on the issuing agency's compliance with prescribed publication requirements.

The third set of complainants consists solely of the Wine Institute, a "non-profit mutual benefit corporation," organized under California law, which represents the California wine industry. On September 19, the Wine Institute filed a petition for review, also challenging the imposition of the 81.25¢ handling charge. According to the Wine Institute, the Board's new pricing system puts the Institute's members at a competitive disadvantage because it "serves to substantially increase the price of lower cost items, such as table wines produced by [the Institute's] members, and substantially decrease the price of higher cost items such as imported products and manufactured liquors." Like the second set of complainants, the Wine Institute alleged violations of the Liquor Code and the Commonwealth Documents Law, as well as violations of procedural due process and the Open Meeting Law.

Accompanying the complaint of the first set of complainants was an application for an *ex parte* preliminary injunction, which the Commonwealth Court denied on September 16. All complainants applied for a preliminary injunction. The Commonwealth Court fixed a hearing date of September 22, 1980.

At the hearing, before President Judge Crumlish of the Commonwealth Court, counsel for the parties presented argument on the statutory violations allegedly committed by the Board. Additionally, the parties stipulated that the September 16 meeting of the Board was advertised and fully open to the public, and that the Board's resolution was not published in the Pennsylvania Bulletin.

Those seeking preliminary relief presented evidence on the issue of harm. Max McCombs, tavern owner and named plaintiff challenging the reduction of the retail licensee discount from 16⅔% to 12½%, claimed that both the physical layout of his bar and the difficulties of pouring "shots" prevented him from switching to larger bottles. Edward Cloonan, State Store manager, president of the State Store Union, and named plaintiff challenging the imposition of the handling charge, sought to identify the effect of the pricing

plan on lower-priced items. Cloonan expressed the opinion that the system of pricing previously in effect "has produced a lot of money and is very profitable with the Commonwealth of Pennsylvania." Various liquor store managers testified that, for the three days the new pricing plan had been in effect, the store they manage experienced a drop in volume of 200 to 300 units. Henry Gage, "Eastern Counselor" for the Wine Institute, estimated that some 90% of the products sold by members of the Institute would be sold at a higher price under the new pricing plan. Gage predicted that the plan would cause a decline in the use of medium-to-lower priced wines.

The Board presented the testimony of Charles Bruggeman, a Board staff employee familiar with the profitability of Board operations and the Touche, Ross report. Bruggeman stated that the new pricing plan was "necessary for the efficient operation of the Board." As to the change in licensee discounts, Bruggeman observed:

"The Board was very concerned about the impact on their licensees. The instruction that was given in developing the pricing policies was to minimize that impact. In fact, the policy adopted by the Board will permit licensees—without changing to larger sizes—simply if they buy the same mixes as they do during the fiscal year '78, '79, they should obtain those goods at about $300 thousand less in total than what they would have paid under the old pricing system."

The Board also had admitted into evidence the Touche, Ross Report.

On September 25, 1980, President Judge Crumlish entered the decree from which the present appeals have been taken. Pursuant to the decree, the Board, its members, its agents, and its employees "are enjoined from implementing the new pricing system as promulgated by Resolution and Motion of the Board adopted September 16, 1980 . . . ." The decree further directed that, as of September 28, 1980, the Board shall continue the retail pricing system in effect before the challenged resolution "pending final hearing, determination

and order of this Court." In an opinion accompanying the decree, President Judge Crumlish stated:

"Upon consideration of the pleadings, evidence, testimony and cogent arguments of counsel, the Court finds that the petitioners have demonstrated a probability of success on the merits. The Court rules further that if it is found that the Documents Law has been violated the petitioners will be irreparably harmed as they will be without an adequate remedy at law."

On the following day the Board filed notices of appeal, working an automatic supersedeas of the decree. See Pa.R. App.Proc. 1736(b). However, on September 30, 1980, the Commonwealth Court granted an application filed by the Wine Institute for the elimination of the automatic supersedeas, and reinstated the decree of September 25. On October 1, 1980, this Court granted the Board's application for a stay pending disposition of the appeals. The new pricing plan remains in effect.

### III

■ We must begin with an inquiry into the standing of the various parties seeking to challenge the Board's resolution. In *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975) (plurality opinion), our many cases on standing were summarized:

"The core concept, of course, is that a person who is not adversely affected in any way by the matter he seeks to challenge is not 'aggrieved' thereby and has no standing to obtain a judicial resolution of his challenge. In particular, it is not sufficient for the person claiming to be "aggrieved' to assert the common interest of all citizens in procuring obedience to the law."

464 Pa. at 192, 346 A.2d at 280–81 (footnotes citing cases omitted). In addition, the relationship between the challenged action and the asserted injury must be direct and immediate, not a remote consequence. Id., 464 Pa. at 191, 346 A.2d at 280 (quoting *Man O'War Racing Ass'n, Inc. v. State Horse Racing Comm'n*, 433 Pa. 432, 441, 250 A.2d 172, 176–77 (1969)).

■ In light of these considerations, the standing of tavern owners, patrons of taverns and restaurants, and customers of State liquor stores cannot seriously be questioned. The resolution of the Board, reducing licensee discounts and increasing the prices of certain relatively low-priced liquor store merchandise, directly affects the price which these complainants will be required to pay for merchandise in the future. See *William Penn Parking Garage, Inc. v. City of Pittsburgh*, supra, 464 Pa. at 194–95, 346 A.2d at 282 (citing cases); see also *Louden Hill Farm, Inc. v. Milk Control Comm'n*, 420 Pa. 548, 552, 217 A.2d 735, 737 (1966) (Roberts, J., joined by Bell, C. J., and Jones, J., dissenting) (milk retailer has "direct interest in any regulation of the Milk Control Commission which prescribes the price at which it may sell its milk").*

## IV

■ We are satisfied that the new pricing plan easily withstands the present statutorily-based attack. Under section 207(b) of the Liquor Code, the Board is fully empowered to "fix ... wholesale ... prices ... " and thus to change the licensee discount. As to the handling charge, we share the view of the Attorney General, whom the Board consulted on the legality of its retail pricing plan:

"Section 207(b) specifically gives the Board the authority to add 'a service or handling charge' to any merchandise 'in the same comparable price bracket, regardless of class, brand or otherwise,' if in the Board's opinion it is 'required for the efficient operation of the State Store System.' A 'fixed allocation cost,' therefore, is permissible so long as it bears some relationship to the actual cost of handling the merchandise."

* On a different footing are the remaining complainants—Pennsylvania Tavern Association, Wine Institute, and Independent State Store Union. None of these parties asserts injury to itself. Instead, each complains on behalf of its membership. Because of our conclusion that the individual complainants have standing to raise the claims before us, we need not reach the issue of whether these associations also have standing.

Here, after careful and thorough study, including a comprehensive audit performed by an outside public accounting firm, the Board determined that the handling charges were required for the efficient operation of the system. Decisions to change discounts afforded certain customers are within the Board's discretion to exercise sound business judgment, as are decisions that each unit of merchandise sold should bear its proportionate share of fixed and variable costs.

■ Nor is there merit to the argument that the Board violated the Documents Law. Pursuant to the broad mandate of section 207(b) of the Liquor Code, the Board must frequently decide whether to add or delete products from store shelves, change prices, and alter marketing strategies. These business-type decisions entrusted to the Board are a unique form of governmental activity which are not amenable to the normal public participation process, and not subject to the Documents Law. "Regulations" subject to the publication requirements of the Documents Law are defined only as:

"any rule or regulation, or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency, or prescribing the practice or procedure before such agency."

§ 102(12), 45 P.S. § 1102(12). Absent a clear statutory mandate, we cannot perceive a legislative intent to treat these business-type decisions as "regulations" falling within the scope of the Documents Law.

■ Cases of this Court and the Commonwealth Court adequately address and dispose of any claimed violation of the Open Meeting Law. Here, the "formal action" was properly taken by the Board at a meeting open to the public. See *Consumers Education and Protective Ass'n v. Nolan*, 470 Pa. 372, 386, 368 A.2d 675, 683 (1977); *Judge v. Pocius*, 28 Pa.Cmwlth. 139, 144, 367 A.2d 788, 791 (1977). So too, we can perceive no violation of procedural due process, as nothing would indicate the requisite deprivation of a property interest. See, e. g., *Bell v. Thornburgh*, 491 Pa. 263, 420 A.2d 443 (1980).

**V**

A preliminary injunction should issue only where "there is urgent necessity to avoid injury which cannot be compensated for by damages and should never be awarded except when the rights of the plaintiff are clear. Also, it should in no event ever be issued unless greater injury will be done by refusing it than in granting it."

*Herman v. Dixon,* 393 Pa. 33, 36–37, 141 A.2d 576, 577 (1958). Accord, *Hospital Ass'n of Pennsylvania v. Commonwealth, Dep't of Public Welfare,* 495 Pa. 225–233, 433 A.2d 450, 454 (1981). Although we must sustain a court issuing a preliminary injunction if there exist "any apparently reasonable grounds," id., here it is clear that the complainants have failed to establish that the Board acted illegally. No "apparently reasonable ground" exists, and the preliminary injunction must be set aside.

Decree of the Commonwealth Court vacated and the applications for preliminary relief dismissed.

O'BRIEN, C. J., and WILKINSON, J., did not participate in the consideration or decision of this case.