# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Chris Gates and Stephen Pascal,  
                  Appellants          :  

                :  

         v.              :  

                :  

City of Pittsburgh Historic Review   :  
Commission and City of Pittsburgh,   :   No. 716 C.D. 2020  
Eve Elsen and James Elsen       :   Submitted: May 13, 2021


BEFORE:   HONORABLE ANNE E. COVEY, Judge  
              HONORABLE MICHAEL H. WOJCIK, Judge  
              HONORABLE ELLEN CEISLER, Judge

OPINION BY  
JUDGE COVEY                                FILED: June 9, 2021

Chris Gates (Gates) and Stephen Pascal (Pascal) (collectively, Appellants) appeal from the Allegheny County Common Pleas Court's (trial court) June 16, 2020 order quashing their appeal from the City of Pittsburgh (City) Historic Review Commission's (HRC) November 6, 2019 decision approving the replacement of several windows in a home in the City's Deutschtown Historic District (District). Essentially, Appellants present one issue for this Court's review: whether the trial court erred by quashing the appeal on the basis that Appellants lacked standing.[1] After review, this Court affirms.

Appellants own several properties in the District located in the City's East Allegheny neighborhood, namely 726-728 Cedar Avenue, which Appellants owned jointly, and 720 Cedar Avenue, which is owned by Pascal. Eve Elsen (Mrs.

---

[1] Appellants present two issues in their Statement of Questions Involved: (1) whether the trial court erred by quashing the appeal because Appellants did not have a substantial, direct, and immediate interest in the HRC's decision; and (2) whether the trial court erred by failing to consider Appellants' appearance and comment at the HRC's hearing as a basis for standing. *See* Appellants' Br. at 2. Because these issues are subsumed in this Court's analysis of whether the trial court erred by quashing the appeal on the basis that Appellants lacked standing, they have been combined and will be addressed accordingly herein.

Elsen) and James Elsen (Mr. Elsen) (collectively, the Elsens) are owners of a property located in the same neighborhood at 1002 Cedar Avenue (Property), approximately one-tenth of a mile, or two blocks, from Appellants' properties, on the same side of Cedar Avenue.

Section 1101.05(a) of the City of Pittsburgh Code of Ordinances, Title 11: Historic Preservation (Code)[2] prohibits exterior alterations on structures located within a historic district without the HRC's review and issuance of a Certificate of Appropriateness. The HRC relies on its *Design Guidelines: Deutschtown Historic District* (Design Guidelines) to assess the appropriateness of proposed exterior alterations to properties in the District.[3] *See* Reproduced Record (R.R.) at 54a-64a.[4] "The HRC may [also] seek recommendations from the community[.]" Section 1101.05(c) of the Code, Code § 1101.05(c).

---

[2] Section 1101.05(a) of the Code states:

> No [e]xterior [a]lterations as defined in [Section] 1101.02(e) [of the Code] . . . shall be undertaken . . . upon a structure located within a Historic District . . . without the review of the [HRC] or the authorized approval of certain routine kinds of exterior work specified by the [HRC] without the formal review and approval of the [HRC] itself, and issuance of a Certificate of Appropriateness.

Code § 1101.05(a); *see also* Section 1101.02(f) of the Code (Certificate of Appropriateness), Code § 1101.02(f). Section 1101.02(e) of the Code defines *exterior alteration* as:

> The alteration of exterior architectural features which can be seen from a public street or way. This shall include projects which require a building, demolition or sign permit and all exterior improvements, alterations and renovations which can be accomplished without obtaining a permit such as change of location of historic object; the kind, color and texture of building materials; the type and design of all windows, doors, lights, stair railings, and other fixtures; and the method of building cleaning.

Code § 1101.02(e).

[3] *See* Section 1101.02(g) of the Code (Design Guidelines), Code § 1101.02(g).

[4] Appellants did not number the pages in the reproduced record using a lowercase "a" after the Arabic figures, as required by Pennsylvania Rule of Appellate Procedure 2173. This Court will cite to the reproduced record in the proper format.

2

In 2015, the Property's previous owners, Thomas Liang and Weiying Mao, applied to the HRC seeking a Certificate of Appropriateness to replace windows in an addition and a dormer on the front of the Property. *See* R.R. at 1a-4a. Regarding windows, Section D of the Design Guidelines (Building Rehabilitation and Alteration) specifies, in relevant part:

> The windows . . . of a building are essential elements of the overall design and architectural style of the building. . . . Original windows . . . should be retained and repaired, wherever possible. If they must be replaced, the new ones should match the originals in size, style, operation, and appearance (including arrangement of glass panes) as closely as possible. New window . . . openings may be installed only where they will not disrupt the character of the building, which usually means on side and rear building elevations.
>
> Wood windows should be used as replacement windows on the front facades of buildings in the [D]istrict. Aluminum or vinyl replacement windows may be used in the sides and rears of buildings (except in the sides of a corner building); all metal windows should be anodized or painted, avoiding a metallic "mill" finish, and should fit the window openings exactly. Window glass may be double-glazed (although it may not be possible to obtain double glazing with true divided light [multi-paned] windows), but reflective and opaque glass, and artificial muntin grids, should be avoided. Glass block may be used only in basement window openings if they can[]not be seen from the street; it should not be used in other window or door openings. Storm windows can be installed, but they should be installed so as to be inconspicuous: if they are on the exterior, they should be colored to match the window frames, sized to fit the openings, and divided like the windows that are being covered.

R.R. at 57a-58a.

The HRC approved the previous owners' request, subject to the following conditions: "[T]he front dormer is to have two windows installed in the existing opening . . . , and the existing windows and openings must be trimmed out

3

in wood, with the profile to be submitted to staff for final approval[,]" and "the front dormer is to be restored to match the adjacent property, with double wood windows and wood to be repaired in-kind and asphalt shingles to be replaced in-kind." R.R. at 4a. Notwithstanding, the Property's previous owners disregarded the HRC's conditions and installed aluminum windows throughout the Property. *See* R.R. at 10a.

The Elsens purchased the Property in 2018. On October 18, 2019, the Elsens filed an Application for a Certificate of Appropriateness (Application) with the HRC, seeking to replace the aluminum windows on the Property's first- and second-floor addition with vinyl windows. *See* R.R. at 81a-85a; *see also* Original Record at 16-17 (photos).

On November 6, 2019, the HRC held a hearing to consider the Application. At the hearing, Mrs. Elsen testified that some of the aluminum windows installed by the previous owners were defective and allowed moisture in, and others were not energy efficient, which rendered some of the Property's rooms uninhabitable during the winter months. *See* R.R. at 10a-11a. Mrs. Elsen claimed that the Property is modern, and not the type of traditional historical home for which the neighborhood is known. *See* R.R. at 11a-12a. Mrs. Elsen described that the vinyl windows would be energy efficient and have the same look as the aluminum windows, with a classic bronze finish, thereby keeping the same "wonderful modern look" on the Property's façade. R.R. at 12a.

Mr. Elsen testified that the Property is unique in that it is located in the District, but that it does not contribute to the District's historic nature and, thus, falls under the Design Guidelines for Non-Contributing Buildings.[5] *See* R.R. at 13a-14a.

---

[5] The Elsens clarify in their brief that the Property "is not a historic structure contributing to the District's historic integrity or architectural qualities." Elsens' Br. at 4.

Section E of the Design Guidelines (Non-Contributing Buildings) provides:

He explained that he learned from his window professional that: the vinyl windows will fit and look like the aluminum windows; most companies no longer sell wood exterior windows; and, replacing the windows with wood as the Design Guidelines required "would probably require a hefty amount of demolition and reconstruction[.]" R.R. at 14a; *see also* R.R. at 15a. Mr. Elsen further admitted that the Elsens had already purchased the vinyl windows, and they cannot be returned. *See* R.R. at 15a, 23a-24a.

Appellants attended the hearing and offered comments opposing the use of vinyl windows at the Property as violative of the Design Guidelines. Specifically, Gates made the following comments at the hearing:

> Two things . . . [.] This is a historic house. Indeed, an ugly addition was placed on the front of it, but it is a historic and contributing building in the [D]istrict, and you can see that from the dormer at the top and the massing and everything else. The other thing is, . . . a missed opportunity by the developer to put in good windows, . . . doesn't mean that [the Elsens] should [not] put in good windows now . . . . Sometime in late 2015 or early 2016, the existing windows were replaced with a [] . . . completely different fenestration. Because there was not a replacement in kind of any sort, the installed windows on the front of this historic building should have been wood. The aluminum windows are bad enough, but replacing with vinyl is a degradation to the entire

---

1. Additions and alterations to, and rehabilitation of, non-contributing buildings in the [D]istrict should either be compatible with the current style and character of each building, or cause the building to become more compatible with the [D]istrict.

2. The HRC shall not require that alterations to non-contributing buildings be made so as to make the buildings appear to be older than they are, or designed in a different style.

3. The HRC shall allow the demolition of non-contributing buildings in the [D]istrict if the demolition will not adversely affect the character of the [D]istrict.

R.R. at 59a-60a.

[District]. If the [Elsens] would like to argue that this addition is modern, then aluminum windows contribute to it; vinyl does not. If we're going to argue that the house is historic, then wood windows contribute to it; vinyl windows do not. There's simply not a situation in which vinyl windows are appropriate here. I perfectly agree that it could have wood windows and still be quite contributing. The aluminum windows do fit with the bump-out, but you could bring the house more into the [] [D]istrict by putting in wood, but vinyl simply doesn't work. Thank you.

R.R. at 16a-18a. Pascal added:

Again, we've been here before on this, and I'm concerned that -- I really think the [HRC] needs to consider that precedent continues to be set here in the [D]istrict, and that the [Design G]uidelines are quite clear, replacement windows should be wooden. . . . [B]asically what I want to say here is that this replacement is neither compliant with the [D]istrict nor a replacement in kind. I appreciate the fact that the previous owner did the cheapest thing possible; that happens a lot in the [D]istrict. And it's unfortunate that the [Elsens] now ha[ve] the responsibility of doing things properly, but . . . those are the rules that we're supposed to follow. . . . I urge you not to approve . . . . Thank you.

R.R. at 18a-20a.

On November 6, 2019, the HRC approved the Elsens' Application by a majority vote. *See* R.R. at 5a-8a, 29a-30a. The HRC issued the Elsens' Certificate of Appropriateness on November 7, 2019. *See* R.R. at 86a. Appellants appealed to the trial court. The City and the Elsens intervened.

On March 9, 2020, the City filed a Motion to Quash Appeal (Motion) claiming that Appellants "own propert[ies] more than two blocks from the [] Property on the same side of Cedar Avenue. They cannot see the Elsen residence from their properties and they failed to establish or even assert any particular harm, financial or otherwise, that the Elsens' windows will cause [] them." R.R. at 153a.

6

The City declared that, since Appellants lacked direct proximity and visibility from their properties and suffered no purported harms due to the HRC's approval of the Elsens' Application, Appellants lack standing and, thus, their appeal should be quashed. *See* R.R. at 150a-157a. The Elsens joined in the City's Motion. *See* R.R. at 158a.

Appellants filed an answer to the Motion with new matter. Therein, they countered: the Elsens did not object to Appellants' standing at the HRC hearing; proximity and financial harm are not required for standing; and the failure to maintain the appropriate standards for the District creates a slippery slope that degrades the District where Appellants purchased property with a reasonable expectation that the neighborhood's historic character would be preserved. *See* R.R. at 159a-166a. After argument, on June 16, 2020, the trial court granted the Motion. *See* R.R. at 168a-186a. Appellants appealed to this Court.[6]

Preliminarily,

> [i]n Pennsylvania, the doctrine of standing . . . is a prudential, judicially created principle designed to winnow out litigants who have no direct interest in a judicial matter. *In re Hickson*, . . . 821 A.2d 1238 . . . ([Pa.] 2003). For standing to exist, the underlying controversy must be real and concrete, such that the party initiating the legal action has, in fact, been "aggrieved." *Pittsburgh Palisades Park, LLC v. Commonwealth*, . . . 888 A.2d 655, 659 ([Pa.] 2005).

*Off. of the Governor v. Donahue*, 98 A.3d 1223, 1229 (Pa. 2014). "[T]he core concept of standing is that a person who is not adversely affected in any way by the matter he seeks to challenge is not aggrieved thereby and has no standing to obtain

---

[6] "This Court's standard of review of [a] trial court's order granting a motion to quash [an] appeal is limited to [determining] whether the trial court committed an error of law, an abuse of discretion, or a violation of constitutional rights." *Driscoll v. Zoning Bd. of Adjustment of City of Phila.*, 201 A.3d 265, 268 n.2 (Pa. Cmwlth. 2018) (quoting *Alma v. Monroe Cnty. Bd. of Assessment Appeals*, 83 A.3d 1121, 1123 n.3 (Pa. Cmwlth. 2014)).

a judicial resolution of his challenge." *Fumo v. City of Phila.*, 972 A.2d 487, 496 (Pa. 2009). "An individual can demonstrate that he has been aggrieved if he can establish that he has a substantial, direct and immediate interest in the outcome of the litigation." *Id.*

> This Court has explained:
>
> A substantial interest in the outcome of litigation is one that surpasses the common interest of all citizens in procuring obedience to the law. A direct interest requires a causal connection between the asserted violation and the harm complained of. An interest is immediate when the causal connection is not remote or speculative.

*Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1215 (Pa. Cmwlth. 2018) (citations omitted).

Appellants argue that the trial court erred by quashing their appeal on the basis that they lacked standing. Appellants declare that they are aggrieved by the HRC's decision. Specifically, Appellants claim that they have a substantial interest in this matter "because the HRC's improper decision to allow the installation of vinyl windows in the [District] renders Appellants' efforts to ensure that their properties conform to the Design Guidelines purposeless and sets a precedent for the Design Guidelines to be ignored." Appellants' Br. at 5. Appellants also assert that their interest is direct because "Appellants' properties are a very short distance away from [the Elsens' P]roperty." Appellants' Br. at 6. Appellants contend that their interest is immediate because, "but for the HRC['s] decision, this departure from the requirements of the Design Guidelines allowing the installation of vinyl windows would not have occurred in the [District] and Appellants' efforts to conform their own properties to the [Design G]uidelines would not be wasted." Appellants' Br. at 6.

This Court acknowledges that Appellants' properties are located in relatively close proximity to the Property and, as owners of properties in the District, Appellants are similarly bound by the District's Design Guidelines. However, that fact alone is insufficient to establish standing to challenge the HRC's decision. *See Morosco v. Historic Rev. Comm'n of Pittsburgh* (Pa. Cmwlth. No. 2106 C.D. 2010, filed February 24, 2012).[7]

First, pursuant to Section 1101.07(a) of the Code, the HRC consists of seven members: one professional preservationist or architectural historian; one architect; three members from the Department of City Planning, the Bureau of Building Inspection, and the Board of Realtors; and two citizen members "who have demonstrated an outstanding interest and/or knowledge of historic preservation and restoration." Code § 1101.07(a). This Court has held that, in light of the HRC's collective expertise, it is entitled to deference regarding whether exterior alterations are compatible in the District. *See Meyer v. City of Pittsburgh Historic Rev. Comm'n*, 201 A.3d 929 (Pa. Cmwlth. 2019); *see also Turchi v. Phila. Bd. of License & Inspection Rev.*, 20 A.3d 586 (Pa. Cmwlth. 2011).

In addition,

> [w]hen determining whether [a] plaintiff[] ha[s] standing to challenge the legality of an action, it must be assumed that the action is in fact contrary to some rule of law. The standing inquiry focuses on the question of whether the plaintiff is a proper person to challenge the alleged illegality. Put another way, assuming that the action is indeed illegal in the fashion claimed by the plaintiff, would he be entitled to any relief.

---

[7] This Court acknowledges that its unreported memorandum opinions may only be cited "for [their] persuasive value, but not as binding precedent." Section 414(a) of the Commonwealth Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a). *Morosco* is cited herein for its persuasive value.

9

*William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 287 n.32 (Pa. 1975).

Here, Section 1101.08 of the Code specifies that "[t]he [HRC] shall consider the following factor[] when reviewing proposed exterior alterations: . . . [t]he appropriateness of the proposal when reviewed in light of the [Design] Guidelines for the [i]ssuance of Certificates of Appropriateness . . . ." Code § 1101.08. Although the HRC is mandated by Section 1101.08(g) of the Code to review applications "in light of the [Design] Guidelines," the Design Guidelines themselves are not law. Section 1101.02(g) of the Code states that the Design Guidelines "establish standards which the [HRC] *can* utilize in determining the appropriateness of applications." Code § 1101.02(g) (emphasis added). Accordingly, the Design Guidelines are statements of policy or standards for the HRC's assessment of a Certificate of Appropriateness application, and aid the HRC's exercise of its discretion. *See Borough of Bedford v. Dep't of Env't Prot.*, 972 A.2d 53 (Pa. Cmwlth. 2009); *Eastwood Nursing & Rehab. Ctr. v. Dep't of Pub. Welfare*, 910 A.2d 134 (Pa. Cmwlth. 2006).

Further, "[f]or standing to exist, the underlying controversy must be real and concrete, such that the party initiating the legal action *has, in fact, been 'aggrieved.'*" *Off. of the Governor*, 98 A.3d at 1229 (emphasis added) (quoting *Pittsburgh Palisades Park, LLC*, 888 A.2d at 659). "A direct interest requires a causal connection between the asserted violation and *the harm complained of*." *Phantom Fireworks Showrooms, LLC*, 198 A.3d at 1215 (emphasis added). "An interest is immediate when the causal connection is *not remote or speculative*." *Id.* (emphasis added). The dispositive issue is whether the challenged conduct harmed or will harm Appellants. Mere allegations of speculative future harm are insufficient to establish standing. *See Ams. for Fair Treatment, Inc. v. Phila. Fed'n of Teachers*, 150 A.3d 528, 536 (Pa. Cmwlth. 2016) ("The mere possibility that future events

10

might occur that could [affect Appellants] . . . is not sufficient to establish the direct and immediate interest required for standing."). In the instant matter, Appellants did not assert at the HRC hearing, at the trial court argument, or in their brief to this Court, any direct non-speculative, immediate effect the HRC's decision has upon them. This Court will not speculate as to any purported losses they have suffered or will suffer as a result of the HRC's decision.

Finally, this Court has declined to confer standing on individual historic district residents who asserted nothing more than a general interest in the preservation of the integrity of buildings in the City's historic district. In *Morosco*, Morosco, a property owner in the City's historic South Side district,[8] objected to the HRC's granting of a Certificate of Appropriateness to another property owner in the South Side historic district to demolish a portion of a property. Morosco appealed to the trial court, and the property owner filed preliminary objections arguing that the neighbor lacked standing to challenge the HRC's decision. Morosco argued that he had standing because, not only was he a South Side district property owner with personal commitment to historic preservation activities therein, but he was personally involved (20 years earlier) with the restoration of the building to be demolished. Notwithstanding, the trial court sustained the preliminary objections and dismissed Morosco's appeal.

On appeal, this Court affirmed the trial court's order, stating:

> Morosco claims that the HRC's decision has harmed him based upon his interest as a property owner in the South Side district and because of his personal involvement in restoration of the [b]uilding that occurred approximately [20] years ago. Morosco also stresses the personal commitment and involvement he has in historic preservation activities, especially in the South Side

---

[8] As in this case, Morosco's property did not abut the property sought to be demolished, nor was it located directly opposite that property. *See Morosco*, slip op. at 7 n.4.

11

district. In this case, we must agree with the trial court's conclusion that, even if we accept Morosco's averments to be true and accurate, he has not pleaded facts that demonstrate that he has been aggrieved by the HRC's decision. He has pleaded no facts that establish any particular harm beyond the common interests of all citizens. The fact that he has a personal interest in historic preservation in the area generally and in the [b]uilding in particular, though laudable, does not establish the type of legal harm and/or interest that is necessary to confer standing. Consequently, we conclude that the trial court did not err in its conclusion regarding Morosco's lack of standing.

*Morosco*, slip op. at 7 (footnote omitted). The *Morosco* Court added that, although an ordinance may confer standing on individuals, the City's "ordinance provisions relating to certificates of appropriateness contain no indication that the [Code] provides individuals such as Morosco with standing." *Id*. at n.4. Just as in the instant matter, Morosco failed to show that he suffered or would suffer economic loss, or that his property would be adversely affected as a result of the HRC's decision.

Here, the HRC weighed Appellants' objections with the circumstances of the Elsens' Application and the Design Guidelines and determined, by a majority vote, that the proposed vinyl windows were compatible with the existing addition on the front of the Property. Because Appellants failed to establish that they are aggrieved by the HRC's decision, they lack standing to challenge that decision.

In the alternative, relying on *Thompson v. Zoning Hearing Board of Horsham Township*, 963 A.2d 622 (Pa. Cmwlth. 2009), Appellants argue that they have standing because they appeared at the HRC's November 6, 2019 hearing and objected to the Application. They specifically claim that "nothing in the Code would preclude an individual from asserting proper standing to appeal an HRC decision based on attendance and comment at an HRC hearing." Appellants' Br. at 13.

However, the mere fact that Appellants attended and commented at the November 6, 2019 hearing does not alone afford them standing. *See Morosco*. In

12

*Thompson*, Thompson appeared at a zoning hearing board meeting and objected to the landowner venture company's variance application, arguing that the variance should be enforced as written. The zoning hearing board granted Thompson party status to which the landowner did not object. The zoning hearing board granted the variance. Thompson appealed to the trial court and the landowner filed a motion to quash the appeal on the basis that Thompson lacked standing because he was not aggrieved. The trial court denied the motion to quash, reasoning that the landowner waived its argument by not challenging Thompson's party status at the hearing. The trial court relied on *Active Amusement Co. v. Zoning Board of Adjustment*, 479 A.2d 697 (Pa. Cmwlth. 1984), and *Baker v. Zoning Hearing Board*, 367 A.2d 819 (Pa. Cmwlth. 1976), wherein this Court ruled that, when a zoning hearing board granted an objector party status without objection, and the zoning hearing board's decision was adverse to that objector/party, the objector/party was necessarily aggrieved by the decision and, thus, had standing to appeal therefrom. On appeal, this Court upheld the trial court's decision.

However, the zoning hearing board's grant of party status to Thompson was pursuant to Section 908 of the Pennsylvania Municipalities Planning Code (MPC),[9] which does not apply to the City. *See Vitti v. Zoning Bd. of Adjustment of*

---

[9] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. § 10908. Section 908 of the MPC, relevant only to zoning hearing boards, provides, in relevant part:

> (3) The parties to the hearing shall be the municipality, any person affected by the application who has made timely appearance of record before the [zoning hearing] board, and any other person including civic or community organizations permitted to appear by the [zoning hearing] board. The [zoning hearing] board shall have [the] power to require that all persons who wish to be considered parties enter appearances in writing on forms provided by the [zoning hearing] board for that purpose.
>
> . . . .

13

*the City of Pittsburgh*, 710 A.2d 653 (Pa. Cmwlth. 1998). Moreover, Appellants were not granted party status at any point in these proceedings. Although the HRC "may seek recommendations from the community" when considering a Certificate of Appropriateness, Code § 1101.05(c), the Code does not authorize the public to appear, present evidence, and cross-examine witnesses when the HRC is accepting public comment on Certificates of Appropriateness,[10] let alone authorize the HRC to grant party status to persons who merely appear and offer objections thereto. Therefore, *Thompson* is inapposite. Accordingly, because Appellants failed to establish that they were aggrieved by the HRC's decision, they have no standing to appeal.

Based on the foregoing, the trial court's order is affirmed.

 

_____
ANNE E. COVEY, Judge

---

(5) The parties shall have the right to be represented by counsel and shall be afforded the opportunity to respond and present evidence and argument and cross-examine adverse witnesses on all relevant issues.

53 P.S. § 10908.

[10] The Elsens state that Section 1101.03(d) of the Code, Code § 1101.03(d), authorizes the public to speak in support of or against an application for a Certificate of Appropriateness. *See* Elsens' Br. at 23. However, that provision applies to nominations, rather than Certificates of Appropriateness.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Chris Gates and Stephen Pascal,    :
                  Appellants    :
                                 :
        v.    :
                                 :
City of Pittsburgh Historic Review    :
Commission and City of Pittsburgh,    :    No. 716 C.D. 2020
Eve Elsen and James Elsen    :

## O R D E R

AND NOW, this 9th day of June, 2021, the Allegheny County Common Pleas Court's June 16, 2020 order is affirmed.

_____
ANNE E. COVEY, Judge