**[J-96-2013] [MO: Baer, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA OFFICE OF THE GOVERNOR | : No. 10 MAP 2013<br>:<br>: Appeal from the Order of Commonwealth<br>: Court dated January 23, 2013 at No. 376<br>: MD 2012<br>: |
| v. | :<br>: ARGUED:  November 20, 2013<br>: |
| SEAN DONAHUE AND THE OFFICE OF OPEN RECORDS | :<br>:<br>:<br>:<br>: |
| APPEAL OF:  OFFICE OF OPEN RECORDS | :<br>: |

**CONCURRING OPINION**

**MADAME JUSTICE TODD**                **DECIDED:  August 18, 2014**

In this case, the Office of the Governor ("OG") seeks a declaratory judgment that the Office of Open Records ("OOR") erroneously concluded in an administrative adjudication, in *dicta*, that the Pennsylvania Right-to-Know Law ("RTKL")[1] requires that an agency respond to requests for records within five business days of any of its employees' receipt thereof, arguing instead that the RTKL requires only that an agency respond within five business days of its *open records officer's* receipt thereof.  I agree with the majority's conclusion that we may reach this issue – albeit, as explained <u>infra</u>, for different reasons – and with its well-reasoned analysis of the RTKL's requirements, as it is clear to me that the RTKL requires that an agency respond to requests for documents within five business days of its open records officer's receipt thereof.  Thus, I

---

[1] 65 P.S. § 67.101 *et seq.*

join parts I and IV of the Majority Opinion. However, I write separately to express my distinct views concerning the issues addressed in Parts II and III of the Majority Opinion.

## I. Standing

In my view, under our traditional standing jurisprudence, OG has suffered no harm to any of its direct and immediate interests, and would ordinarily lack standing to pursue the relief it seeks, thus requiring it to await normal administrative, then judicial, proceedings to raise this issue. The majority's conclusion to the contrary is, in my view, an unacknowledged departure from our extant standing doctrine. Nevertheless, in the unique context of this case, where OG stands in the shoes of numerous governmental agencies that require guidance in the conduct of their sovereign legal duties, where an underlying case provides a sufficient factual predicate for review, and where the question presented concerns a purely legal and procedural issue, I find the agencies' need for guidance outweighs our traditional concerns regarding the development of issues and the proper function of the judicial power as applicable in this case, and, thus, warrants our proceeding to the merits.

As the majority explains, the issue presented herein arose initially when Sean Donahue emailed a request for records to an OG employee, who forwarded the request to the agency's open records officer. Thereafter, beyond five business days from the employee's initial receipt, but within five business days of the open records officer's receipt of the email, OG responded, granting the request in part and denying the request in part. Donahue appealed to OOR, arguing that, pursuant to 65 P.S. § 67.901 ("Section 901"),[2] OG's failure to respond within five business days of its employee's

---

[2] Section 901 provides that "[u]pon receipt of a written request for access to a record, an agency shall make a good faith effort to . . . respond as promptly as possible under the circumstances . . . The time for response shall not exceed five business days from the date the written request is received by the open-records officer for an agency. If the (continued…)

receipt of the email required that his request be "deemed denied" and that, pursuant to extant OOR interpretations of the statute, required that OG disclose all the records sought. Ultimately, OOR issued an adjudication, agreeing with Donahue's arguments in that regard, but denying relief on other grounds.

Thereafter, OG brought a dual jurisdiction action in the Commonwealth Court seeking: (1) appellate review of the adjudication; and (2) a declaratory judgment that OOR erred in agreeing with Donahue's construction of Section 901. With respect to the appellate action, the Commonwealth Court entered a single-judge order quashing the appeal, reasoning that OG, having prevailed below, lacked standing to appeal. With respect to the declaratory judgment action, OOR argued that OG had suffered no harm to its immediate interests and, thus, lacked standing to pursue declaratory relief. The Commonwealth Court disagreed, entering a similar single-judge order finding that the adjudication had harmed OG by creating "controversy between [OOR] and [OG], and uncertainty . . . over the proper interpretation of the [RTKL]." Commonwealth v. Donahue, 376 M.D. 2012 (Pa. Cmwlth. filed Aug. 28, 2012) (order). The declaratory judgment action then proceeded to a three-judge panel and, regarding the standing issue, the court refused to reconsider its earlier order. Commonwealth v. Donahue, 59 A.3d at 1167 n.5 (Pa. Cmwlth. 2013). OOR timely appealed to this Court.

In its opinion, the majority reasons that, notwithstanding the fact that OOR's announcement of its view of Section 901 was *dicta*, OG has standing to maintain the declaratory judgment action because OOR's defense of that *dicta* in the instant proceedings is the functional equivalent taking an official "position." Majority Opinion at 11. Moreover, the majority concludes OOR's position injures OG because it imposes

---

(…continued)
agency fails to send the response within five business days of receipt of the written request for access, the written request for access shall be deemed denied."

administrative burdens – that is, it will "shorten the window for responding to RTKL record requests, thereby making it more difficult . . . to comply with the time requirements of Section 901," increasing "the likelihood of deemed denials" and "the number of RTKL matters that OG is forced to adjudicate with OOR." Id. at 11 (footnote omitted). The majority further opines that its holding is consistent with decisions recognizing "the justiciability of declaratory judgment actions seeking pre-enforcement review of an administrative agency's interpretation and enforcement of a governing statute." Id. at 12 (citing Arsenal Coal v. Commonwealth, 477 A.2d 1333 (Pa. 1984); Bayada Nurses, Inc. v. Commonwealth, 8 A.3d 866 (Pa. 2010)). Respectfully, I disagree, as in my view our traditional standing jurisprudence indicates that OG has suffered no injury permitting it to seek declaratory relief.

As a matter of prudence, Pennsylvania courts do not issue advisory opinions and, thus, a party seeking to invoke judicial power must ordinarily demonstrate that it has standing – that the asserted legal violation of which it complains has caused harm to one of its substantial, direct, and immediate interests. Pittsburgh Palisades Park v. Commonwealth, 888 A.2d 655, 659-60 (Pa. 2005). The requirement of standing serves not only to enable courts to better resolve complex legal issues, but also to ensure that they do not exceed the proper bounds of judicial power and assume roles of self-appointed ombudsmen of the other coequal and coordinate branches of government. See Zemprelli v. Daniels, 436 A.2d 1165, 1168 (Pa. 1981); Raines v. Byrd, 521 U.S. 811 (1997); cf. Antonin Scalia, The Doctrine of Standing as an Essential Element of Separation of Powers, 17 Suffolk U.L. Rev. 881 (1983).[3]

---

[3] Although federal and Pennsylvania justiciability doctrines are distinct in that federal courts lack the power to issue advisory opinions, while Pennsylvania courts have the power, but, out of caution, decline to exercise it, the doctrines' policy goals and substance are substantially similar, and this Court has frequently used federal (continued…)

In keeping with those goals, this Court has consistently refused to exercise judicial power to remedy speculative future harms. In <u>Pittsburgh Palisades Park</u>, the petitioners, who intended to apply for gaming licenses, sought to challenge a statute providing for the refund of license fees in the event of subsequent legislative changes to the legal regime governing the gaming industry, arguing it "handcuffed" the General Assembly from making such changes and violated that body's exclusive right to exercise legislative power. This Court held that the petitioners lacked standing, in part, because they had not yet even applied for gaming licenses and because there was no evidence that the legislature had sought to change, but been restrained from changing, gaming law:

> Petitioners . . . at this juncture they have not been issued a gaming license and there have been no allegations that legislators have been "handcuffed" by the prospect of returning gaming fees. Thus, any possible harm to Petitioners is wholly contingent on future events. As such, they have no immediate interest in this constitutional challenge. As Petitioners have no . . . immediate interest in challenging the constitutionality of [the statute], we find that they lack standing to bring this challenge.

<u>Pittsburgh Palisades Park</u>, 888 A.2d at 660-61; <u>see</u> <u>also</u> <u>City of Phila. v. Commonwealth</u>, 838 A.2d 566, 578 (Pa. 2003) (noting that "abstract or uncertain" allegations that a statute may harm a city's reputation or cause decreased economic activity are not "sufficient to confer standing").

Consistent with this doctrine, both the United States Supreme Court and this Court have held that a party may not ordinarily challenge the validity of an administrative agency's legal interpretations in the absence of their enforcement, except

---

(…continued)
justiciability doctrine to inform its own decisions. <u>See</u> <u>Rendell v. Pa. State Ethics Comm'n</u>, 983 A.2d 708, 717 n.10 (Pa. 2009).

where the issue presented is adequately developed for review and where the regulation at issue has a direct and immediate effect on the regulated parties – that is, where deferring review would place the party seeking relief in a double bind, requiring it to comply at great cost or, in the alternative, run the risk of violating a lawful statute or regulation and incurring onerous burdens. Compare Abbott Laboratories v. Gardner, 387 U.S. 136, 149-56 (1967) (permitting challenge to FDA's authority to promulgate certain regulations governing drug labeling where the legal issue was fully developed and where deferring review would force the manufacturers to either discard their stock of labeling and promotional materials or risk prosecution, civil and criminal penalties, and public stigma); and Arsenal Coal Co., 477 A.2d at 1339 (Pa. 1984) (citing Abbott and Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 162-165 (1967), in permitting challenge to DER's authority to promulgate rules concerning the anthracite mining industry where the issue was adequately developed and deferring review would result in either compliance at significant cost or the risk of strong civil sanctions); and Bayada Nurses, Inc. v. Commonwealth, 8 A.3d 866, 876 (Pa. 2010) (permitting challenge to Department of Labor regulation refusing to apply wage and hour law's "domestic services" exemption to home healthcare agencies' employees where it was adequately developed and where deferring review would result in either compliance at significant cost or the risk of strong civil and criminal sanctions) with Toilet Goods Ass'n, supra (dismissing challenge to FDA's authority to promulgate regulations concerning inspections of food additive manufacturing facilities where the legal issue could be aided by further factual development and where deferring review would lead, at most, to a suspension of the right to do business which could be immediately appealed).

Thus, in the instant case, OG would typically be required to demonstrate that OOR's ruling has caused harm to its immediate interests, which it may do by

demonstrating an actual or imminent injury, or by demonstrating that the legal issue it raises is adequately developed and that OOR's ruling has created a double-bind that will, regardless of OG's decision to comply or not, impose significant burdens on its interests. As an initial matter, OG does not explain how the *dicta* has already caused or will imminently cause it injury. Since OOR ruled that OG was entitled to withhold the documents Donahue requested, its ruling has had no instant effect, and its proffered injuries are purely prospective.

Furthermore, although the question is closer, OG does not demonstrate that OOR's conclusion, assuming it is OOR's definitive interpretation of the statute,[4] concerns a legal issue which is adequately developed and has a direct and immediate effect upon it such that deferring review would place it in a double-bind requiring compliance at great cost or, in the alternative, running the risk of violating a lawful statute or regulation and incurring onerous burdens.

First, I question whether, as contemplated by the Abbott/Arsenal Coal decisions, the instant issue is sufficiently developed for review. In making this determination, we consider "whether the claim involves uncertain and contingent events that may not occur as anticipated or at all; the amount of fact finding required to resolve the issue;

---

[4] I have some concern with the majority's *sub silentio* decision to extend the Abbott/Arsenal Coal line of decisions outside the context of formal administrative regulations, and note that the Abbott decision was, in some measure, predicated on the view that such regulations were final, formalized decisions of the agency itself. See Abbott, 387 U.S. at 151 (noting that it did not address informal regulations, tentative positions, or decisions of subordinate officials). Although perhaps it is wise to extend the Abbott Court's reasoning to all agency positions which are formally or functionally definitive, and although OOR's ruling below and its advocacy in the instant proceedings may be relevant in determining whether it has taken a definitive position as to the RTKL's requirements, and counsel toward a conclusion that it has done so, the rationale of the Abbott/Arsenal Coal line of decisions would appear less appropriate in the context of uncertain agency positions, adjudicative *dicta*, and the rulings of subordinate officials, which are less likely to apply in future cases and, thus, to burden regulated parties.

and whether the parties to the action are sufficiently adverse." Twp. of Derry v. Pennsylvania Dep't of Lab. and Indus., 932 A.2d 56, 58 (Pa. 2007). Herein, OG's claim necessarily assumes that, in the future, RTKL requestors will, *contrary to the RTKL's requirements*, submit their requests for records to OG employees other than its open records officer, and that its employees will not forward the requests to the open records officer in a sufficiently timely manner to permit him or her to respond thereto within five business days of the initial receipt of the request. See 65 P.S. § 67.703 (providing that requests "must be addressed to the open-records officer" and directing employees to forward them "to the open-records officer"). On the present record, it is far from clear that this scenario is an oft-recurring one for OG. Moreover, although we are presented with a purely procedural and purely legal question of statutory interpretation, I am unconvinced that OG and OOR are sufficiently adverse to one another's interests, or, at least, as adverse to one another as an agency and a party actually seeking disclosure of records from that agency might be. Thus, at a minimum, it is an open question as to whether or not the issue of the RTKL's response requirements is, at this time, sufficiently developed for judicial review.

Second, in my view, OG has failed to demonstrate that OOR's adjudication placed it in a dilemma of compliance or noncompliance, where either option comes at great cost. Admittedly, OOR's *dicta* may give OG pause as to how it should deal with improperly filed and less-expeditiously forwarded RTKL requests for records in the future, its burdens do not appear both substantial and unavoidable. On one hand, if OG acquiesces in OOR's expressed view of the RTKL's requirements, it may have to adopt new procedures for handling improperly filed RTKL requests, which could require some administrative expense. Without elaborating on the claim or offering supporting

evidence, OG asserts compliance would come "at a significant administrative burden." OG's Brief at 12.

On the other hand, especially if it deems the administrative expense too onerous, it can reject OOR's view, and, if necessary, litigate the question. Thus, if a future RTKL requestor improperly files a request for records with one of OG's employees other than its open-records officer, and if the employee delays in forwarding the request to the open-records officer, it can follow its own view of the statute and respond within five business days of the open-records officer's receipt. At that point, if the requestor appeals, OG will have the option of pursuing an interlocutory appeal challenging OOR's view that its delay constitutes a deemed denial and, thus, that it has jurisdiction to hear the appeal, whereupon it may obtain the review it seeks now. Cf. Pa.R.A.P. 312; 313. Alternatively, if OG does not pursue or obtain interlocutory review, and OOR persists in its enunciated view of the RTKL's requirements, OG will have the opportunity to appeal to the Commonwealth Court as of right and to this Court in its discretion and, at maximum, may be required to disclose documents.[5] Finally, if OG does not obtain interlocutory relief, and OOR reverses its position as to the RTKL's requirements, OG will suffer no burden whatsoever.

Thus, OOR's ruling requires OG to choose between what it views as an unjustified administrative burden or a quite remote possibility that it may be required to disclose challenged documents. In my view, pursuant to Abbott and Arsenal Coal,

---

[5] I question whether OOR will persist in its view of Section 901's provisions concerning the effect of a deemed denial where a response is untimely, as this Court has cast doubt upon, and the Commonwealth Court has definitively rejected, the view that a deemed denial works a waiver of an agency's defenses to disclosure of all the documents requested. See Levy v. Senate of Pa., 65 A.3d 361, 382-83 (Pa. 2013) (holding that an agency's failure to provide all bases for its denial of a request does not bar it from asserting different bases before OOR); McClintock v. Coatesville Area Sch. Dist., 74 A.3d 378 (Pa. Cmwlth. 2013) (applying Levy to deemed denials).

these choices do not warrant departure from the normal course of judicial review to raise the question of whether OOR's current view of the statute is correct.

The majority notes that OOR's interpretation of Section 901 presents OG with a choice to comply with potential additional administrative burdens, or not to comply and await judicial review. Majority Opinion at 10-11 & n.10. I note that we have, at this point, no substantive allegations as to the frequency of improperly filed and untimely filed requests, no evidence as to what administrative changes would be required to respond to them, and, thus, no meaningful basis upon which to discern what, if any, effect acquiescence in OOR's interpretation would have on OG or other Commonwealth agencies not involved in this litigation. Compare Abbott, 387 U.S. at 152 (noting that the drug manufacturers compliance would require them to "change all their labels, advertisements, and promotional materials," "destroy stocks of printed matter" and "invest heavily in new printing type and new supplies."); Gardner v. Toilet Goods Ass'n, Inc., 387 U.S. 167 (1967) (noting the drug manufacturers alleged compliance would cost millions of dollars per drug). Moreover, even assuming we may take judicial notice of these costs, and assuming those costs would be great, Abbott/Arsenal Coal decisions require not only that compliance come at great cost, but that a party may not rely on the ordinary process of judicial review because, in the interim, it will incur similarly great sanctions. Indeed, the majority appears to depart from this Court's prior decisions permitting pre-enforcement review of administrative regulations and extend such review to parties who incur relatively ordinary and innocuous burdens applicable to all parties subject to administrative regulation. In Arsenal Coal, fifty-five coal operators and producers filed an action challenging the Department of Environmental Resources' authority to promulgate regulations governing the extraction and production of anthracite coal, the violation of which subjected them to numerous civil penalties,

including the denial of a permit to continue business. <u>Arsenal Coal</u>, 477 A.2d at 1334-38. In holding that the matter was ripe for judicial review, we noted that, consistent with <u>Abbott</u>, the coal companies were faced with a Hobson's choice of compliance or noncompliance, either of which would subject them to great costs:

> Appellants may refuse to comply and test the regulations by appealing, for example, a denial of permit to operate, or a denial of bond release, or by defending actions imposing sanctions for non-compliance. 52 P.S. § 1396.4(b). This proposed avenue of review is beset with penalties and impediments to the operation of the anthracite industry rendering it inadequate as a satisfactory alternative to the equitable action initiated under the original jurisdiction of Commonwealth Court.
>
> The alternative to challenging the regulation through noncompliance is to submit to the regulations. We cannot say that the burden of such a course is other than substantial, accepting, as we must on a motion to dismiss on the pleadings, the allegations of the complaint as true. Appellants have alleged that the regulations require the expenditure of substantial sums to comply which, while not immediately calculable, will substantially impair the cash flow of all Appellants. Whether or not this allegation is true, it is clear that if Appellants elect to comply and await judicial determination of validity in subsequent piecemeal litigation, the process would be costly and inefficient.

<u>Arsenal Coal</u>, 477 A.2d at 1340.

Likewise, in <u>Bayada Nurses</u>, a 38-office, 1,000-employee home care services corporation sought to challenge a Pennsylvania Department of Labor regulation refusing to apply wage and hour law's "domestic services" exemption to home healthcare agencies' employees, the violation of which would have subjected it to strong civil and criminal penalties. <u>Bayada Nurses</u>, 8 A.3d 866 at 877. Applying the <u>Abbott</u>/<u>Arsenal Coal</u> framework, we concluded that matter was ripe for review, in part, because denial of review would place the healthcare provider in a similar double bind:

> Bayada is faced with the option of continuing its operations, and ignoring the Department's interpretation regarding overtime requirements and risk penalties and fines, including criminal sanctions, or complying with what it believes to be the Department's erroneous interpretation and awaiting a judicial determination in subsequent litigation, in the interim bearing the not insignificant cost of compliance.

Bayada Nurses, 8 A.3d at 876. By contrast, in the instant case, OG has not been placed in a Catch-22 whereby its only two choices are to comply, or not comply, and in either event will suffer serious hardships similar to those in Arsenal Coal and Bayada Nurses.

Indeed, the United States Supreme Court's decision in Toilet Goods Ass'n is an instructive guide. Therein, the court refused to engage in pre-enforcement review of the FDA's authority to promulgate regulations concerning inspections of food additive manufacturing facilities, noting that the inquiry included consideration of "the degree and nature of the regulation's present effect on those seeking relief." Toilet Goods Ass'n, 387 U.S. at 164. The Court found the regulation's effects insufficiently onerous because its impact would not "be felt immediately by those subject to it in conducting their day-to-day affairs" but instead would depend on whether the FDA decided to inspect:

> This is not a situation in which primary conduct is affected—when contracts must be negotiated, ingredients tested or substituted, or special records compiled. This regulation merely states that the Commissioner may authorize inspectors to examine certain processes or formulae; no advance action is required of cosmetics manufacturers, who since the enactment of the 1938 Act have been under a statutory duty to permit reasonable inspection of a "factory, warehouse, establishment, or vehicle and all pertinent equipment, finished and unfinished materials; containers, and labeling therein." Moreover, no irremediable adverse consequences flow from requiring a later challenge to this regulation by a manufacturer who refuses to allow this type of inspection. Unlike the other regulations challenged in this

> action, in which seizure of goods, heavy fines, adverse publicity for distributing "adulterated" goods, and possible criminal liability might penalize failure to comply, a refusal to admit an inspector here would at most lead only to a suspension of certification services to the particular party, a determination that can then be promptly challenged through an administrative procedure, which in turn is reviewable by a court. Such review will provide an adequate forum for testing the regulation in a concrete situation.

Toilet Goods Ass'n, 387 U.S. at 164 (citations and footnotes omitted). Herein, OG will incur no significant "irremediable adverse consequences" if we delay review of OOR's view of the statute, as, at most, its refusal to acquiesce would lead to a deemed denial and ordered disclosure of documents in its possession, both of which could then, as I note above, "be promptly challenged through an administrative procedure" and reviewed by the Commonwealth Court as of right, and by this Court in its discretion.

Finally, I am concerned that the majority's decision to extend Abbott/Arsenal Coal to the instant context will give rise to significant unintended consequences. By permitting a challenge to an administrative agency's *dicta* based on speculative future administrative and litigation burdens, the Court virtually ensures that future parties, private and public alike, will have a right to challenge the validity of legal pronouncements made in statutes, formal and informal regulations, ordinances, adjudicative (and even judicial) *dicta* based solely on the "uncertainty" that such pronouncements may or may not be accurate, purely on the ground that the statute regulates conduct in which they intend to engage. Granting such a right virtually guarantees that this Court will be embroiled in poorly developed, ill-considered, and largely academic debates examining other governmental entities' legal judgments.

Accordingly, I would not attempt to sanction standing in this matter under the umbrella of Abbott and Arsenal Coal. Rather, in the fairly unique context of this case, and given that our application of the standing doctrine is prudential in nature, I am

inclined to apply a more holistic view. As noted above, this Court refuses to issue advisory opinions largely out of concern that doing so robs the court of the practical factual predicate and adversarial argument necessary for the resolution of complex legal issues. In the instant matter, however, the need for legal guidance is greater than the average case, as OG, as well as the multifarious other state governmental agencies subject to the RTKL's requirements, have a sovereign duty to follow the law in their day-to-day responsibilities and to do so faithfully in the interests of the citizenry. Cf. Georgia v. Tennessee Copper Co., 206 U.S. 230, 237 (1907) (noting that the state has an interest not only in its own rights but, as *quasi*-sovereign, in the property rights of its citizens); Massachusetts v. EPA, 549 U.S. 497 (2007) (relying on Tennessee Copper to find that Massachusetts had standing to challenge the EPA's failure to regulate greenhouse gases). Indeed, although OG's claim, like any other particular agency's claim, that it will receive improperly filed requests for documents in the future is speculative, it seems a fair assumption that, given the vast bulk of the administrative state, the issue will arise with some regularity in the future across the affected agencies. Moreover, although OG has abandoned its appeal from the Donahue decision, its arguments arise directly from OOR's conduct in that case, such that Donahue provides context for the practical consideration of the issues presented. Likewise, although, as noted supra, OG and OOR may not be sufficiently adversarial parties with respect to the substantive controversy over OG's records, OG has essentially challenged OOR's jurisdiction such that OOR is likely to defend the case with vigor akin to a party seeking the disclosure of OG's records. Finally, given that the issue is a purely legal issue of statutory interpretation concerning an exclusively procedural question, I am less concerned that taking up review will embroil this court in precipitous questioning of the substantive policy judgments of another branch of government. Thus, although I do not

join what I view as the majority's broad reframing of the standing doctrine, which could have far-reaching consequences in future cases, I find that the agencies' need for guidance under this peculiar set of circumstances substantially outweighs the concerns underlying our traditional standing approach, and I am willing to reach the merits notwithstanding OOR's claim that OG lacks standing.

## II. Exhaustion

With respect to the doctrine requiring the exhaustion of administrative remedies, I agree with the sentiments expressed by the majority and Chief Justice Castille in his Concurring Opinion that the unique circumstances of this case warrant some dispensation regarding that rule. As the majority recognizes, the doctrine requiring exhaustion of administrative remedies may give way where "the administrative process has nothing to contribute to the decision of the issue and there are no special reasons for postponing . . . decision" or deciding the issue now serves to avoid the proliferation of "a multiplicity of duplicative lawsuits" by providing "a tidy global resolution," and both principles are plainly applicable in the instant matter. See Majority Op. at 18-20 (internal citations and quotation marks omitted); see also Concurring Opinion (Castille, C.J.) at 8-9.[6] Given the marginal benefit that delaying consideration would garner, and the substantial burden that reaching the issue now would alleviate, I am willing to reach the merits notwithstanding OOR's claim that OG has failed to exhaust its administrative remedies.

---

[6] However, I reiterate that, contrary to the majority's view, as detailed above, Arsenal Coal and its progeny do not apply in the instant context.