J-A33031-14

2015 PA Super 53

| IN RE: RAYMOND G. PERELMAN CHARITABLE REMAINDER UNITRUST UNDER AGREEMENT OF TRUST DATED APRIL 25, 1996 | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: JEFFREY E. PERELMAN | |
| Appellant | No. 151 EDA 2014 |

Appeal from the Decree of December 9, 2013
In the Court of Common Pleas of Philadelphia County
Orphans' Court at No.: 529 IV of 2013

| IN RE: RAYMOND AND RUTH PERELMAN COMMUNITY FOUNDATION UNDER AGREEMENT OF TRUST DATED AUGUST 21, 1995, AS AMENDED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: JEFFREY E. PERELMAN | |
| Appellant | No. 155 EDA 2014 |

Appeal from the Decree of December 9, 2013
In the Court of Common Pleas of Philadelphia County
Orphans' Court at No.: 520 IV of 2013

| IN RE: RAYMOND AND RUTH PERELMAN EDUCATION FOUNDATION UNDER AGREEMENT OF TRUST DATED AUGUST 21, 1995, AS AMENDED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: JEFFREY E. PERELMAN | |
| Appellant | No. 162 EDA 2014 |

Appeal from the Decree of December 9, 2013
In the Court of Common Pleas of Philadelphia County
Orphans' Court at No.: 519 IV of 2013

| | |
|---|---|
| IN RE: RAYMOND AND RUTH PERELMAN JUDAICA FOUNDATION UNDER AGREEMENT OF TRUST DATED AUGUST 21, 1995, AS AMENDED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: JEFFREY E. PERELMAN | |
| Appellant | No. 163 EDA 2014 |

Appeal from the Decree of December 9, 2013
In the Court of Common Pleas of Philadelphia County
Orphans' Court at No.: 521 IV of 2013

| | |
|---|---|
| IN RE: RAYMOND AND RUTH PERELMAN FAMILY CHARITABLE FOUNDATION UNDER AGREEMENT OF TRUST DATED APRIL 25, 1996, AS AMENDED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: JEFFREY E. PERELMAN | |
| Appellant | No. 164 EDA 2014 |

Appeal from the Decree of December 9, 2013
In the Court of Common Pleas of Philadelphia County
Orphans' Court at No.: 528 IV of 2013

BEFORE:  LAZARUS, J., WECHT, J., and STRASSBURGER, J.[*]

OPINION BY WECHT, J.:                    **FILED MARCH 17, 2015**

Jeffrey Perelman appeals the decrees[1] of the Philadelphia County Court

of Common Pleas Orphans' Court sustaining the preliminary objections of

---

[*]     Retired Senior Judge assigned to the Superior Court.

- 2 -

Raymond Perelman to Jeffrey's[2] petitions. In those petitions, Jeffrey seeks production of a broad array of documents pertaining to various charitable trusts (the "Charitable Entities") established by Raymond as settlor and administered by Raymond as an original trustee, as well as records from various entities that allegedly are controlled by Raymond. Jeffrey alleges that these Raymond-controlled entities improperly did business with the Charitable Entities. The orphans' court sustained Raymond's preliminary objections solely upon the basis that Jeffrey lacked standing to seek the production in question. Although we do not pass upon any of Jeffrey's specific document requests, we conclude that the orphans' court erred in finding that Jeffrey lacked standing to attempt to establish a legal basis for the production in question. Accordingly, we reverse the orphans' court decrees sustaining Raymond's preliminary objections, and we remand for further proceedings.

_(Footnote Continued)_ ——————————

[1] As the caption indicates, this decision encompasses five separate appeals, which this Court consolidated _sua sponte_ pursuant to Pa.R.A.P. 513 by order entered on February 27, 2014. As explained at greater length, _infra_, the substance of the underlying proceedings, the orphans' court's rulings, and the appeals at issue enables us to provide a unitary discussion that applies equally to all five appeals.

[2] The parties, the orphans' court, and now this Court, adopt the convention of referring to the various members of the Perelman family involved in this action, or its genesis, by their given names to minimize confusion. Our employment of this convention is a convenience, but by no means suggests that this Court views the parties informally.

The orphans' court has provided the following factual and procedural background of this case:

On June 27, 2013, Jeffrey Perelman ("Jeffrey") filed amended petitions seeking a court order requiring his father, Raymond Perelman ("Raymond"), to produce for inspection and copying all books and records related to the administration, distribution and investment of the following charitable foundations[1] established by Raymond and his Wife, Ruth Perelman ["Ruth"][3]:

The Raymond and Ruth Perelman Judaica Foundation[,]

The Raymond and Ruth Perelman Community Foundation, and[]

The Raymond and Ruth Perelman Education Foundation[.]

According to Jeffrey, these three foundations were established by separate, identical Agreements of Trust dated August 21, 1995. Jeffrey also filed amended petitions relating to the Raymond G. Perelman Charitable Remainder Unitrust under Agreement of Trust dated April 25, 1996 and the Raymond and Ruth Perelman Family Charitable Foundation under Agreement of Trust dated April 25, 1996.[4]

_____

[3] Jeffrey requested, in the alternative, that Raymond be directed "to prepare and file with the [orphans' court] accountings of the administration of the [Charitable Entities]." Amended Petition for Inspection of Books and Records (521 of 2013) ¶¶ 65. Given the sweep and nature of Jeffrey's requests, it is difficult to distinguish those requests from an overarching request for an accounting, except insofar as they also seek records from outside entities that he alleges did improper business with the Charitable Entities. Because the requests are effectively indistinguishable from an accounting, we view them as the latter, as to which there is far more relevant case law.

[4] Based upon the parties' approaches to these cases and our review of the record, we understand that these various entities are all subject to materially identical governing documents, and that Jeffrey's arguments are identical as to each. Accordingly, we address all of the petitions, docketed in the Philadelphia County Orphans Court at 519, 520, 521, and 528 IV

*(Footnote Continued Next Page)*

- 4 -

¹ Jeffrey had initially filed a petition seeking this information on April 24, 2013. When preliminary objections were filed by Raymond and Ronald Perelman, however, Jeffrey responded by filing his amended petitions.

In addition to inspecting and copying the books and records of the Charitable Entities, Jeffrey also seeks to inspect and copy "the books and records of the entities with whom the Education Foundation engaged in business and/or financial transactions" that were owned or controlled by Raymond [or Jeffrey's brother, Ronald Perelman ("Ronald")⁵], individually or as trustee. [Raymond and Ronald] vigorously opposed these petitions, asserting, *inter alia*, that they should be dismissed because Jeffrey lacks standing to pursue them. It is undisputed, for instance, that Jeffrey was not a beneficiary of any of these charitable foundations. In addition to Jeffrey's lack of standing, Raymond asserts that Jeffrey's petition should be dismissed for failure to join or identify indispensable parties. He claims that it is also factually defective in failing to name the business entities whose corporate books and records are sought. Raymond also maintains that Ruth [Perelman's] estate ["Ruth's Estate" or the "Estate"]⁶ faces no liability attributable to the administration of the Foundation during her trusteeship for various reasons. In response, Jeffrey argues that he has standing as the executor of [Ruth's E]state and as a successor trustee. . . .

### Factual Background

An analysis of [Jeffrey's] standing to gain access to the books and records of the [Charitable Entities] hinges on the various documents and amendments to those documents that were executed to establish the [C]haritable [Entities]. On August 21,

*(Footnote Continued)* ────────────────

of 2013, in a unitary discussion. As noted, *supra*, we refer to them collectively as the "Charitable Entities."

⁵ Ronald is not a party to the instant appeal.

⁶ Ruth was an original trustee for the Charitable Entities, although her trusteeship allegedly was terminated several years before her death.

1995, [Ruth and Raymond] executed an Agreement of Trust ("August 21, 1995 Trust Agreement" or "1995 Trust Agreement") to establish the Raymond and Ruth Perelman Education Foundation. In this agreement, they designated themselves as trustees or original trustees. As Raymond notes, this foundation is exempt from income taxation as a private foundation within the meaning of the Internal Revenue Code of 1986. One key provision of this initial 1995 trust agreement that is at the heart of the present dispute is Item FOURTH which provides:

> FOURTH—Irrevocability: This trust is expressly stated to be irrevocable, provided, however, that this trust, except for this Item FOURTH, may be amended at any time or times by written instrument or instruments signed and acknowledged by the Original Trustees then serving. However, no amendment shall authorize the Trustees to conduct the affairs of this trust in any manner or for any purpose contrary to the provisions of Section 501(c)(3) of the Code.

Another key provision of the initial 1995 trust agreement is Item SEVENTH, which states:

> SEVENTH—Trustees: Additional and Successor Trustees may be appointed as follows:
>
> 1. The Original Trustees may, if they deem it appropriate, by joint action, or by the sole action of the latter to serve of them, appoint at any time, or from time to time, Additional or Successor Trustees; and by joint action, or by the sole action of the latter to serve of them, dismiss any such Additional or Successor Trustee, with or without cause, and without any requirement to appoint a replacement. This authority to appoint Additional Successor Trustees does not foreclose a decision by the Original Trustees, or by the latter to serve of them, to administer the Foundation without Additional and Successor Trustees until such time as both of the Original Trustees are no longer serving.
>
> 2. Upon the termination of service by any Trustee, for whatever reason, no accounting shall be required, unless an original Trustee, or a majority of all Trustees other than the terminating Trustee, shall

insist, and the release by the remaining Trustees of the terminating Trustee shall be a complete discharge to the terminating Trustee of all liability for his or her service.

August 21, 1995 Trust Agreement, Item SEVENTH.

On February 12, 1996, Raymond and Ruth amended this initial August 21, 1995 Trust Agreement for the Education Foundation with the "First Amendment and Restatement of the Raymond and Ruth Education Foundation" (hereinafter "February 12, 2006 Amended Trust Agreement"). Item FOURTH was amended as follows to give Raymond sole authority to amend the trust prior to his death:

> FOURTH—Irrevocability: This trust is expressly stated to be irrevocable; provided, however, that this trust, except for this item FOURTH, may be amended at any time or times by written instrument or instruments signed and acknowledged by RAYMOND PERELMAN. However, no amendment shall authorize the Trustees to conduct the affairs of this trust in any manner or for any purpose contrary to the provisions of Section 501(c)(3) of the Code. In addition, after RAYMOND PERELMAN's death, resignation or permanent incapacity, at any time, or from time to time, the then surviving Trustees shall have the power to amend this Agreement or any of its terms in any manner required for the sole purpose of ensuring that the trust qualifies and continues to qualify under Section 501(c)(3) of the Code.

Significantly, this amendment was signed by both original settlors and trustees who were then serving: Ruth and Raymond Perelman.

Item SEVENTH of the February 12, 1996 Amended Trust Agreement likewise continued to provide that "no accounting" would be required upon the termination of "service by any Trustee, for whatever reason" unless an original trustee "shall insist." Moreover, "the release by the remaining trustees of the terminating Trustee shall be a complete discharge to the terminating Trustee of all liability for his or her service."

On November 12, 2007, Raymond amended the February 12, 1996 Amended Trust Agreement. Two years later, on August 18, 2009 Raymond revoked in its entirety the February 12, 1996

Amended Trust Agreement. In so doing, he removed Ruth as original trustee. He also changed the successor trustees upon Raymond's death from his sons Jeffrey and [Ronald] to Ronald and Debra Perelman ["Debra"]. Ruth died [on] July 31, 2011.

In 2013, Raymond executed more amendments to the trust document. On May 13, 2013, Raymond, serving as the sole Original Trustee of the trust, revoked the November 12, 2007 Amendment and the August 18, 2009 Amendment in their entirety. This May 13, 2013 Amendment further provides that the successor trustees upon Raymond's death would be [Ronald and Debra]. A few weeks later, on May 29, 2013, Raymond once again amended the trust to provide in Item SEVENTH that "at no time" shall [Jeffrey] serve as a successor trustee for this foundation. By document dated June 11, 2013[,] Raymond amended and restated the trust for the Raymond and Ruth Perelman Education Foundation. It appoints Ronald and Debra to serve with him as additional trustees of the foundation upon acceptance of that appointment. It states Jeffrey shall never serve as successor trustee. According to Raymond, this June 11, 2013 Amendment and Restatement is the "operative governing" trust document for the Education Foundation.

Orphans' Court Opinion ("O.C.O."), 12/6/2013, at 1-4 (footnoted citations to the record omitted).

Citing Jeffrey's non-beneficiary status, the breadth of his requests for disclosure, Ruth's failure to seek compensation for her service while she was alive, and the absence of any imminent tax liability as well as Raymond's commitment individually to indemnify Ruth's Estate for any liability arising from Ruth's trusteeship for the Charitable Entities, by decrees dated December 4, 2013, docketed on December 6, 2013, and transmitted to the

parties on December 9, 2013,[7] the orphans' court determined that Jeffrey lacked standing to request the information in question and sustained Raymond's preliminary objections to Jeffrey's petitions. This timely appeal followed.[8]

Before this Court, Jeffrey raises the following issues:

1. Does [Jeffrey], as Executor of [the Estate], have standing to bring the petitions below seeking discovery in support of a request, by [Ruth's] Estate, for compensation through the date of her death for Ruth's service as trustee?

2. Does Jeffrey, as Executor of [Ruth's] Estate, have standing to bring the petitions below seeking discovery relating to management of the [Charitable Entities] during Ruth's service as a trustee to assess the Estate's potential liability to the Internal Revenue Service for transactions engaged in by the [Charitable Entities] during her tenure?

Brief for Jeffrey at 2-3.

_____

[7] Jeffrey purported to appeal the December 4, 2013 decrees. However, pursuant to Pa.R.A.P. 108(a)(1), "the day of entry [of an appealed-from order] shall be the day the clerk of the court . . . mails or delivers copies of the order to the parties," as required by Pa.R.C.P. 236(a)(2). Our docket has been corrected to reflect this fact.

[8] The orphans' court did not direct Jeffrey to file a concise statement of the errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The court relies upon the opinion it issued contemporaneously with the appealed-from orders in satisfaction of its obligation to furnish this Court with an opinion under Rule 1925(a). That opinion provides an explanation of the basis for the orphans' court's rulings that is sufficient to enable our thorough review of the issues presented.

Both issues address Jeffrey's standing, in his capacity as executor of Ruth's estate, to request certain documentation of the Trusts and other related entities.[9]

> A party seeking judicial resolution of a controversy must, as a prerequisite, establish that he has standing to maintain the action. Standing requires a party to have a substantial interest in the subject matter of the litigation; the interest must be direct; and the interest must be immediate and not a remote consequence. The inquiry into standing ascertains whether a party is the proper party entitled to make the legal challenge to the matter involved. A person who has no stake in the matter has no standing to obtain judicial resolution of his challenge to the matter.
>
> A trustee must file an accounting when directed to do so by the Orphans' Court division, and may file an account at any other time. 20 Pa.C.S.A. § 7181. The court may cite the trustee, on application of a person in interest, to file an account of the management of a trust estate. Further, a trustee must file an accounting upon the request of the beneficiary of the trust. However, even the next of kin of a beneficiary of a trust has no interest in the trust, which would automatically entitle such person to demand that the trustee file an accounting. If, upon citation to file a formal account, the trustee acquiesces without challenge and provides a formal accounting to the next of kin of the beneficiary of the trust, then the trustee cannot be heard to argue that the next of kin lacks standing to demand a filing of an account.

---

[9]   In the orphans' court, Jeffrey also sought to establish standing as a successor trustee, opining that Raymond's amendments to the Charitable Entities' governing documents purporting to remove him from that status were improper and ineffective. The orphan's court rejected this argument. Jeffrey does not appeal, and we need not consider, that aspect of the orphans' court's ruling.

*Rock v. Pyle*, 720 A.2d 137, 142 (Pa. Super. 1998) (case citations omitted).

Although the factual background, as condensed above, is somewhat confusing, Jeffrey's issues on appeal are straightforward. First, Jeffrey submits that Ruth's Estate, for which he serves as executor, has standing to examine the Charitable Entities' records to determine whether Ruth, and by extension the Estate, are entitled to compensation for her administrative role *vis-à-vis* the Charitable Entities. Second, Jeffrey submits that the Estate has standing to seek the records in question to determine whether the Estate might be exposed to liability to the IRS for any actions or transactions by the Charitable Entities that occurred while Ruth shared responsibility for the Charitable Entities' administration.

Jeffrey's issues pertain to the orphans' court's rulings sustaining Raymond's preliminary objections to Jeffrey's disclosure requests. "Preliminary objections, the end result of which would be dismissal of a cause of action, should be sustained only in cases that are clear and free from doubt." *Bower v. Bower*, 611 A.2d 181, 182 (Pa. 1992).

> A demurrer admits as true all well-pleaded facts and all inferences reasonably deducible from them, but not any conclusions of law. Only if upon the facts averred, the law says with certainty that no recovery is permitted will this Court sustain the demurrer. Where a doubt exists as to whether a demurrer should be sustained, this should be resolved in favor of overruling it.

*Buchanan v. Brentwood Fed. Sav. & Loan Ass'n*, 320 A.2d 117, 120 (Pa. 1974) (citations and internal quotation marks omitted); *see Stahl v. First Pa. Banking & Trust Co.*, 191 A.2d 386, 389 (Pa. 1963). The scope of our review of an order sustaining preliminary objections is plenary. *Solomon v. Gibson*, 615 A.2d 367, 368 (Pa. Super. 1992). We begin with Jeffrey's second issue, which concerns the Estate's potential exposure to IRS liability.

In rejecting Jeffrey's argument that he had standing to seek discovery to assess the Estate's potential exposure to IRS liability associated with the administration of the Charitable Entities, the orphans' court explained as follows:

> In the initial August 21, 1995 Perelman Education Foundation Trust Agreement, the settlors expressed their intent that "the release by the remaining Trustees of the terminating Trustee shall be a complete discharge of the terminating Trustee of all liability for his or her services." This same position is expressed in the June 11, 2013 Amendment and Restatement of the Perelman Education Foundation Agreement[,] which states in Item TENTH (G) that "the release by the Original Trustee, or a majority of the trustees then serving other than the terminating trustee if the Original Trustee is not then serving, shall be a complete discharge to the terminating trustee of all liability for the terminating trustee's service." With this clear, unambiguous language Ruth and Raymond, and after Ruth's removal and death[] Raymond alone[,] reiterated a straightforward mechanism for providing a complete discharge for a terminating trustee such as Ruth.
>
> Raymond followed through with the option set forth in the trust agreements by executing a "Release, Indemnification and Waiver of Accounting Agreement" on May 29, 2013. With this document[,] which specifically references the Ruth and Raymond Perelman [Education] Foundation Trust Agreement of August 21,

> 1995, and its subsequent amendments, Raymond released "Ruth Perelman from any liability for her service, if any, as a Trustee of the Trust" while waiving "the preparation and filing of an account of the administration of the Trust during the period Ruth served as a Trustee of the Trust." Based on the clear language of these documents, the [Estate] has been discharged from any liability relating to the management of the Perelman Education Foundation so that Jeffrey, as her executor, cannot claim to be aggrieved or have standing.

O.C.O. at 7-8.

In his Omnibus Memorandum of Law in Opposition to Preliminary Objections ("Jeffrey's Memorandum"), Jeffrey presented the following argument:

> Raymond's claim that Ruth's Estate has no potential liability [to the IRS] because of his "release" is almost comical. The potential liability of Ruth's Estate that Jeffrey raised in the Amended Foundation Petitions is to the IRS for the way Raymond has administered the Foundations, stripped them of cash and made investments in business interests controlled by Ronald. The IRS is not bound by Raymond's "release" if Ruth's Estate has potential liability, and given his own potential exposure, Raymond's indemnification is likely worthless.

Jeffrey's Memorandum at 21. Before this Court, Jeffrey largely repeats these assertions, noting that in his petitions he provided ample basis for concern in the Foundations' IRS 990-PF forms. He emphasizes that, in the context of preliminary objections, the orphans' court was obligated to assume the truth of those averments, and should have granted discovery on that basis. *See* Brief for Jeffrey at 30-31. In support of the insufficiency of Raymond's indemnification commitment, Jeffrey quotes this Court's decision

in ***Woodburn v. Consolidation Coal Co.***, 590 A.2d 1273 (Pa. Super. 1991):

> [F]or a party responsible [for] complying with safety regulations, to ignore those regulations because of an indemnity clause in a contract is very risky. That clause only has meaning if the indemnitor has the assets to satisfy its agreed indemnification. In these cases, the plaintiff can seek collection of his entire judgment against any party found liable. The indemnitee may be required to pay the full judgment and, if the indemnitor is financially weak, not be compensated.

***Id.*** at 1277.[10]

Identifying Jeffrey's IRS concerns as a "puzzling gambit," Raymond essentially responds that Jeffrey's petition properly was denied because there is no present IRS claim against the Charitable Entities or the Estate, and the Estate has been released and indemnified for any such liability. Brief for Raymond at 40. In support of his first point, Raymond notes that the statutes cited by Jeffrey as possible bases for IRS liability provide that liability can be imposed upon a trust manager only upon a showing that the manager knowingly "participated" in improper conduct. ***See id.*** at 41-42 (citing 26 U.S.C. §§ 4941, 4944). "While Jeffrey alleges misconduct by Raymond," Raymond observes, "he portrays Ruth as an innocent bystander, which would shield her and her Estate from any liability to the IRS under the

---

[10]  Notably, the promise of personal indemnification that Raymond cites was created years after Ruth's death, and more years still after her service as a trustee was terminated. Consequently, Ruth could not have relied upon it in any way.

- 14 -

very statutes he cites. . . . As such, there simply is no basis that [the] Estate can be held liable for any violation of federal law relating to private foundations." *Id.* at 42 (emphasis in original).

In one of several instances in which Raymond directly impugns Jeffrey's motives, he explains as follows:

> These are yet additional indicators confirming personal, ulterior motives are driving Jeffrey, *i.e.*, his stated desire to oust Raymond from the Charitable Entities he created and funded, and to take control of them (and their millions of dollars) himself.

*Id.* at 43. Raymond argues that "this Court should not countenance such conduct, just as the Orphans' Court did not." *Id.*[11] Consequently, Raymond contends, Jeffrey's concerns regarding the Estate's exposure to IRS liability are "entirely speculative." *Id.* As such, these concerns, being "wholly contingent on future events," cannot support standing. *Id.* (citing *Pittsburgh Palisades Park, LLC v. Commonwealth*, 888 A.2d 655, 660 (Pa. 2005)).

---

[11] In the same passage alone, Raymond refers to Jeffrey's "personal animus for Raymond" and his "reprehensible and troubling" "harassment." Brief for Raymond at 43. Elsewhere, Raymond cites Jeffrey's "personal and inappropriate motives," his "enmity toward Raymond, and his related "confus[ion] regarding the proper discharge of his fiduciary duties to Ruth's Estate." *Id.* at 49. Raymond cites no sources to establish a foundation for his serial imputations regarding Jeffrey's allegedly improper motives. Because Jeffrey's interests or motives have no bearing whatsoever on the pure questions of law concerning his standing that we are called upon to consider, we will treat these insinuations as no more than the irrelevant surplusage that they are.

In his second argument, Raymond argues that the Estate's interest is wholly unfounded by virtue of the Charitable Entities' governing documents' express release and discharge of any terminating trustee's "liability for his or her service." *Id.* at 44. Raymond avers that Ruth "consented to this mechanism for releasing a trustee when she signed the 1995 Agreements and the 1996 Agreements." *Id.* at 44-45. He further maintains that subsequent amendments to the agreements that were executed after Ruth died did not substantively modify the effect of this provision. *Id.* at 45. Raymond further argues that, in his individual capacity, Raymond provided the Estate "a broad indemnification from 'any and all liabilities' (including tax liabilities and penalties) for [Ruth's] service as trustee," and in support of that contention quotes Raymond's May 24 2013 "Release, Indemnification and Waiver of Accounting Agreement." *Id.* at 46 (citing, *inter alia*, Raymond and Ruth Perelman Judaica Foundation Release, Indemnification and Waiver of Accounting Agreement, 5/24/2013, at 2 ¶ 7).[12]

There is scant Pennsylvania authority relative to the standing questions presented. But it seems clear to us that the question lying at the heart of the issues presented is a practical one: While it may be true that

---

[12] Raymond asserts that "[t]hese binding provisions are broad enough on their own to foreclose any potential liability for Ruth's Estate to the IRS." Brief for Raymond at 46. However, he cites no legal authority to support the proposition that the IRS would consider itself bound in its enforcement, or must do so under any applicable law, by any discharge agreement between private parties.

Jeffrey's pleadings do not assert present misconduct with certainty, Jeffrey submits that the information he seeks will enable him to determine whether the Estate for which he is responsible is at risk of exposure to IRS liability. In suggesting that Jeffrey is on an unbounded fishing expedition motivated by animus rather than fiduciary concern, Raymond disregards Jeffrey's detailed recitation of potentially wrongful transactions and relationships entered into by the Trusts during Ruth's tenure. Jeffrey's allegations are fortified by reference to the publicly available 990-PF forms for the Charitable Entities and span fourteen detailed paragraphs of specific allegations concerning various business relationships that, at first blush, might be problematic for the Charitable Entities' Subsection 501(c)(3) status under the Internal Revenue Code.

Among the averments that the orphans' court was obligated by law to accept as true for pleading purposes were the following:

- The schedules attached to the Charitable Entities' IRS Form 990s indicate that those entities have ownership interests in land, buildings, and equipment that are leased to entities, which are named by Jeffrey, that allegedly are owned or controlled by Raymond "either individually [or] as a trustee of the Charitable Remainder Unitrust" in violation of the Internal Revenue Code, which violation can expose managers to a 5% excise tax,[13] Amended Petition for Inspection of Books and Records (521 IV of 2013) at ¶¶ 42, 43-45.

_____

[13] Although the orphans' court is not obligated to defer to Jeffrey's conclusions of law, **Buchanan**, 320 A.2d at 120, that does not mean the court may turn a blind eye to averments of fact that establish a question

*(Footnote Continued Next Page)*

- These holdings included a $34 million stake in Revlon, Inc., and Revlon Worldwide, entities substantially owned by Ronald, who also was a disqualified person under the Internal Revenue Code, *id.* at ¶¶ 49-50;

- Certain of these outside entities had not made lease payments due to the Charitable Foundations, and receivables to the Charitable Entities had "swelled to more than $150 million," *id.* at ¶¶ 46, 48,

The documents requested by Jeffrey, putatively to evaluate the tax implications of these and other alleged misdealings, included "[l]eases, rental agreements or any other agreements that support the rental income amounts reported by the [Charitable Entities] and identify the parties who were charged rent"; "accounts receivable records that support the amounts reported" by the Charitable Entities to the IRS; "documents relating to any collection activities in connection with the amounts reported as accounts receivable"; and "[b]ills of sale, agreements, [etc., that] relate to the ownership, purchase, sale or transfer of title to any assets owned or held by the Foundations." *Id.* at ¶ 63.

It cannot credibly be disputed that, were Jeffrey to learn that Ruth was associated in any way with any misconduct by the Charitable Entities *vis-à-vis* the Internal Revenue Code such that the Estate might be held liable or that her service as a trustee was merely contemporaneous with such

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯

regarding compliance. For example, while a court need not accept a plaintiff's averment that a defendant was negligent as a matter of law, it should not grant a demurrer when the facts as pleaded set forth a *prima facie* case of negligence.

misconduct by another trustee, his best course would be to inform the IRS and work proactively to rectify the situation. This approach plainly is more likely to minimize the Estate's exposure, not only because it will reduce the fines and/or penalties associated with the oversight or misconduct but also, less quantifiably, because it can be expected to engender good will.

It is equally clear to us that Raymond's putative indemnification of the Estate is immaterial. Should the IRS detect misconduct in the administration of the Charitable Entities during Ruth's tenure and determine that it has cause to seek sanctions against the Charitable Entities and trustees—an assessment that is wholly independent of whether Ruth ultimately is exonerated—her Estate's exposure will consist not only of the prospect of surcharges, but of the potentially considerable expense to the Estate of resolving the situation, whether favorably or not. Furthermore, the terms of the putative indemnification concern, at most, only "any liability" the Estate may suffer. It is not clear that Raymond willingly would read this to refer also to the costs of the Estate's defense, which could be considerable, given the complexity and scale of the Charitable Entities and what appear from Jeffrey's pleading to be their elaborate transactional histories. And finally, while Raymond asserts that he has ample resources to follow through on the indemnification, Jeffrey can have no assurance that Raymond will have those resources at some future time, or that Raymond will not contest the applicability of the indemnification clause.

On the other hand, our law is clear that standing should be viewed stringently, and we must assess Jeffrey's asserted bases for standing with some skepticism. Raymond is correct that speculative harm, standing alone, does not create standing. *See Pittsburgh Palisades Park*, 888 A.2d at 660-61. But *Pittsburgh Palisades Park* is inapposite, because it involved the question of aggrievement in connection with litigation, not standing to seek production or an accounting in advance of any specific action to recover damages or to determine whether there is tax or other exposure to the IRS that would best be resolved proactively. In short, neither *Pittsburgh Palisades Park* nor any other authority cited by Raymond addresses standing to seek information to determine, rather than seek indemnification for, the Estate's exposure. Necessarily, what qualifies as stringency must differ in the context of accountings and their equivalent, which involve some element of speculation; one does not seek an accounting to discover what he already knows.

We find that the orphans' court too quickly dismissed Jeffrey's concerns. Given that the question arose on preliminary objections, the orphans' court was bound by law to assume the veracity of Jeffrey's averments and grant Jeffrey the benefit of all favorable inferences to be derived therefrom. *See Buchanan*, 320 A.2d at 120. Based upon our review, Jeffrey's averments clearly and with ample detail set forth bases for concern regarding the administration of the Trusts while Ruth was still a director.

The remedy for this is to reverse the orphans' court decrees sustaining Raymond's preliminary objections and to remand for further proceedings. We intend no prejudice to Raymond's right to challenge any particular subcategory of Jeffrey's requests for discovery. If any of the requests do not appear to be calculated to lead to the discovery of admissible evidence, are not tailored to the action, or reflect a fishing expedition, the orphans' court may reject them. **_See generally_** Pa.R.C.P. 4003.1 (providing that "a party may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action" and that even requests that will produce only inadmissible evidence are permissible "if the information sought appears reasonably calculated to lead to the discovery of admissible evidence"); **_Berkeyheiser v. A-Plus Investigations, Inc._**, 936 A.2d 1117, 1127 (Pa. Super. 2007) (holding that the trial court must ensure that the requests "are tailored" to the specific action and that discovery requests that reflect "a mere fishing expedition" should not be allowed). We hold only that Jeffrey's pleadings, in his capacity as executor for Ruth's Estate, satisfied the threshold standing requirements to allow the production of documents or an accounting, provided that the requests are appropriately fashioned to address Jeffrey's stated concerns—*i.e.*, whether

the Charitable Entities have complied in full with the applicable requirements of the Internal Revenue Code.[14]

We now turn to Jeffrey's first stated issue, in which he argues that the orphans' court erred in denying his discovery requests to the extent that they served his effort to determine whether Ruth's Estate is entitled to compensation for Ruth's service as an original trustee. Speaking generally, a trustee's right to reasonable compensation is well-established, without regard to whether the governing trust document(s) expressly so provide. **In re Reed**, 357 A.2d 138, 140-41 (Pa. 1976) (citing, *inter alia*, Restatement (Second) of Trusts § 242 (1957)) ("It is well established that if a deed . . . creating a trust is silent as to compensation, a trustee is entitled to receive a reasonable allowance on the income passing through his hands during the term of the trust . . . ."). Moreover, in the instant case, during Ruth's

---

[14] Discovery such as that sought in the first case should be governed in the first instance by Orphans' Court Rule 3.6, which provides as follows: "The local Orphans' Court . . . may prescribe the practice relating to . . . discovery [and the] production of documents . . . . To the extent not provided for by such general rule or special order, the practice relating to such matters shall conform to the practice in the Trial or Civil Division of the local Court of Common Pleas." Philadelphia County Orphans' Court rule 3.6.A(1) provides, in relevant part, only that "leave to . . . obtain discovery or the production of documents[] may be granted only on petition upon cause shown." Consequently, for general standards we turn next to Philadelphia County's local civil rules. However, nothing in the Philadelphia County Court of Common Pleas Civil Division's local rules relevantly upsets the application of the Pennsylvania Rules of Civil Procedure governing discovery. Consequently, for purposes of resolving the instant matter, the orphans' court is governed by the prevailing general standards governing discovery.

service the governing documents for the Charitable Entities expressly provided for trustee compensation. **See, e.g.**, The Raymond and Ruth Perelman Judaica Foundation, 8/21/1995, Item FIRST ¶ 5 ("Trustees shall be entitled to reasonable compensation for services rendered as Trustees as well as for other services rendered [in other capacities] . . . .").

The orphans' court explained its refusal to provide such discovery with the following brief comment:

> Exactly why Jeffrey needs the extensive discovery he requests to determine whether Ruth may be due compensation as trustee as expressly provided for in the governing document is unclear. If, as Jeffrey suggests, Ruth was entitled to compensation by the document, wouldn't that information suffice? Moreover, Raymond notes that Ruth never sought compensation for her services as trustee for these charitable foundations during her lifetime. Since Jeffrey is one of the prime beneficiaries under her will, there is an element of self-serving in his requests. In any event, Jeffrey fails to explain why this discovery is necessary and therefore, his standing as to this request is unsupported.

O.C.O. at 8-9.

We detect problems with this reasoning. First, our case law is clear that, in the absence of a specification in the underlying trust documents as to how a trustee will be compensated, a court may determine what constitutes the "reasonable" compensation provided by law. **See In re Kennedy's Trust**, 72 A.2d 124, 126-27 (Pa. 1950); **see also In re La Rocca's Trust Estate**, 213 A.2d 666, 668 (Pa. 1965) (citing **In re Mastria's Estate**, 196 A.2d 653 (Pa. 1964)) (observing that the determination of proper compensation is "a matter peculiarly within the

knowledge, competence and experience" orphans' court). Inasmuch as one permissible method of calculating compensation involves deriving compensation as a percentage of trust assets under management, **see Kennedy**, 72 A.2d at 126-27, the need is manifest for more information than a mere trust provision indicating in general terms that compensation may be awarded. Furthermore, much as does Raymond, the orphans' court appears to infuse its reasoning with assumptions about Jeffrey's motives, which do not bear upon the legal questions presented. That Jeffrey is a beneficiary of the Estate hardly strikes us as a sound reason to object to his efforts to ensure that the Estate collect such monies as it is rightly entitled to. Finally, the orphans' court's ultimate reliance upon the lack of specificity as to how various items of discovery would inform the compensation inquiry, while certainly reasonable taken in isolation, does not inform Jeffrey's **standing** to seek such discovery.

We also find unpersuasive the orphans' court's and Raymond's contentions that, as a matter of law, no claim will lie for compensation because Ruth failed to seek it during her lifetime and thereby waived any such claim by the Estate. While a trustee may waive, explicitly or by conduct, her right to compensation, **see In re Card's Estate**, 9 A.2d 557, 559 (Pa. 1939), merely declining to seek compensation is not sufficient to defeat the right at a later time to seek it. **Reed**, 357 A.2d at 141-42. As **Reed** makes clear, whether a trustee has waived the right to compensation is a case-specific and fact-intensive inquiry, one seldom if ever suited to

resolution in the context of a demurrer. While the orphans' court may, on remand, find upon a duly developed record, that Ruth intended to waive her contractual right to reasonable compensation, it erred in doing so based solely upon the pleadings.

To be clear, the orphans' court's concern that the documents Jeffrey seeks might not be relevant to the calculation of any compensation due Ruth's Estate certainly warrants consideration on remand. However, were the court to determine that the Estate is entitled to compensation, and that such compensation should be calculated by percentage of assets or transactions, certain records might be required to drill down into the assets of the Charitable Entities beyond that information found in those entities' Form 990s. As well, additional information may assist in determining the degree of Ruth's involvement in the day-to-day activities of the Charitable Entities, which reasonably could inform the assessment of how much compensation would be reasonable.

Jeffrey does not, in his amended petitions, distinguish which documents would assist in determining whether the Estate might be liable to the IRS from the documents that would assist in determining appropriate compensation, if any. Nonetheless, we find as a threshold matter that Jeffrey has standing to seek such information as would be necessary to determine the Estate's right to compensation for Ruth's service. As with the document requests *vis-à-vis* tax compliance, because it dismissed Jeffrey's petition for want of standing, the orphans' court made no effort to identify

which requests, if any, were appropriately tailored to inform the potentially meritorious concerns raised by Jeffrey.

As with our analysis of the IRS issue, we will not make that assessment in the first instance, nor will we conclude at this time that Jeffrey is entitled to any discovery at all. Rather, we will entrust that assessment to the orphans' court, underscoring that court's broad discretion to demand of Jeffrey that he proffer some tangible nexus between the requested records and the IRS and compensation inquiries, as well as some indication as to why those records will suffice where the records already in his possession cannot.

For the foregoing reasons, we reverse in their entirety the orphans' court's decrees sustaining Raymond's preliminary objections to Jeffrey's document requests, and we remand for further proceedings consistent with this opinion.

Decrees reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/17/2015